**Yu KIKUMURA, Plaintiff–Appellant,**

v.

**C.A. TURNER, Defendant–Appellee.**

**No. 93–1847.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1994.

Decided June 27, 1994.

Joan H. Burger, Teresa A. Massa (argued), Meites, Frackman, Mulder & Burger, Chicago, IL, for plaintiff-appellant.

Deborah D. Sorkin, Dept. of Justice, General Litigation/Legal Advice Section, Washington, DC, James M. Hipkiss, Office of the U.S. Atty., Civil Div., Fairview Heights, IL, Candice Will (argued), Dept. of Justice, Office of Professional Responsibility, Washington, DC, for defendant-appellee.

Before FAIRCHILD, CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

Yu Kikumura is a prisoner in the United States Penitentiary in Marion, Illinois. He is

serving a 262–month sentence following a conviction for explosives and passport offenses.[1] He is suing C.A. Turner, the prison warden, for prohibiting him from receiving mail in Japanese. This action, Kikumura claims, violates his rights under the First Amendment and the Equal Protection Clause. He seeks damages, as well as injunctive and declaratory relief.

██ The district court granted summary judgment in Turner's favor, finding that Turner was entitled to qualified immunity, and that the challenged actions did not violate Kikumura's "clearly established constitutional rights." *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The court never expressly addressed Kikumura's claims for injunctive and declaratory relief, leading us at the outset to question whether we have before us a "final decision of the district court," which is a necessary predicate to our own jurisdiction. 28 U.S.C. § 1291. But the court unequivocally entered a final judgment here, granting the defendant's motion for summary judgment in its entirety. R.O.A. 36; *see also infra* p. 8. Our jurisdiction is therefore certain, and we review the entry of summary judgment de novo.

### I.

### A

Kikumura's amended complaint alleges that the Bureau of Prisons on more than 20 occasions rejected incoming paperback books, letters, newspapers and magazines on the ground that such material posed a threat to prison security. Kikumura attached to his complaint several memoranda addressed to him and signed by Warden Turner. The memoranda indicate that "[u]pon review of the publication, I have determined that its entry into this institution could be detrimental to the security, good order and discipline of the institution. I have based this decision on the fact that these publications are printed in Japanese and, therefore, can not [sic] be monitored or reviewed by institution staff and could jeopardize the security and orderly running of the institution." R.O.A. 1.

Kikumura's amended complaint alleges that, in denying him these publications, Turner violated his First and Fifth Amendment rights. While the reference to the Fifth Amendment in the amended complaint suggests that Kikumura was raising a procedural due process claim, *see* R.O.A. 10 at 5b, Kikumura argued in his memorandum opposing the motion for summary judgment that the blanket policy of refusing all Japanese language publications violates the "Equal Protection element of the Fifth Amendment." R.O.A. 21 at 5. *See generally Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954) (applying the equal protection clause to the federal government through the Fifth Amendment's due process guarantee). Warden Turner has never sug-

---

1. Kikumura was arrested at the Vince Lombardi rest stop on the New Jersey Turnpike, on April 12, 1988, after a police officer spotted three homemade bombs in his car. He also had a map indicating an area in New York City where a Naval recruitment office is located. Though the applicable guidelines range was 27–33 months, the district court granted what Judge Becker described on appeal as the "largest upward departure from an applicable guideline range, in absolute or percentage terms, since the sentencing guidelines became effective," *United States v. Kikumura*, 918 F.2d 1084, 1089 (3d Cir.1990), imposing a 360 month sentence.

The upward departure was based on the district court's conclusion that Kikumura—a member of the Japanese Red Army who spent much of 1986 and 1987 at a terrorist camp in Lebanon's Bekaa valley—intended to bomb the Naval recruitment center on April 14, 1988. On that date, the two year anniversary of the United States air attacks on Libya (that were themselves in retaliation for Libya's alleged responsibility for the bombing of a nightclub in West Berlin), a bomb exploded outside an American U.S.O. club in Naples, Italy. Italian officials believe that Junzo Okudaira, Kikumura's colleague in the Japanese Red Army, was responsible for that bombing. The district court concluded that Kikumura's "mission in the United States was to carry out a parallel attack on American soil," presumably at the Naval recruitment center. *See United States v. Kikumura*, 706 F.Supp. 331, 339 (D.N.J.1989).

The 360 month sentence was vacated on appeal, with the Third Circuit concluding that after an upward departure the applicable guideline range could be no more than 210–262 months. On remand, the district court sentenced Kikumura to 262 months, and that sentence was affirmed on appeal. *United States v. Kikumura*, 947 F.2d 72 (3d Cir.1991).

gested that the complaint failed to put him on notice of Kikumura's equal protection claim, *see Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). He has rather responded to the merits of that claim, both before the district court, R.O.A. 30 at 6, and on appeal, Br. at 21–23. We therefore read the complaint to allege violations of both the First Amendment and the equal protection clause, as made applicable to the federal government through the Fifth Amendment.[2]

### B

Throughout the relevant period the Justice Department Bureau of Prisons regulations provided that prisoners' incoming mail is to be rejected "only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." 28 C.F.R. § 540.71(b); Bureau of Prisons Policy Statement 5266.5. The regulations note that a publication may be rejected if it "is written in code," 28 C.F.R. § 540.71(b)(4), though they say nothing about publications in languages other than English. The Supreme Court, in *Thornburg v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989), upheld these regulations as against a broad-based First Amendment challenge.

The general Bureau of Prisons regulations are supplemented by local prison rules. The Marion Institution Supplement, at issue here, saw a number of proposed changes and actual amendments during the course of this litigation. In rejecting Japanese language publications sent to Kikumura, Warden Turner cited to Institution Supplement MAR–5266.5B, which says that "[p]ublications in languages other than English may be received only by those inmates who are unable to read or understand English. These publications must be sent from a publisher or bookstore and the package must be clearly marked to indicate the sender."

Warden Turner does not maintain that—before Kikumura filed suit—Turner made any effort to try to find a translator or otherwise screen Kikumura's incoming mail before summarily rejecting it. Only after

Kikumura filed his suit did the prison consider changing its policy of blanket rejection of incoming Japanese publications. Beginning in July 1992, the prison began looking for a way to translate the incoming publications, though found all such alternatives to be prohibitively expensive.

The Marion staff ultimately located a Bureau of Prisons employee, working at the Federal Correctional Institution in Englewood, Colorado, who is proficient in Japanese. Beginning January 11, 1993, Kikumura's incoming Japanese language publications have been forwarded to the employee in Colorado, who screens the materials and returns them to Marion.

The staff at Marion also drew up a draft document called Institution Supplement MAR–5266.5C, dated January 18, 1993, which was to replace Institution Supplement MAR–5266.5B. The proposed new policy contained far more elaborate protection for foreign language publications than the old. Under the proposed guidelines, incoming publications in foreign languages would be reviewed, where possible, by a Marion staff member with sufficient language skills. Where no such staff member was available, the "Inmate Systems Manager will attempt to locate a Bureau of Prisons employee at another location with foreign language skills in the language in which the publication is printed." The Inmate Systems manager will also "maintain a listing of Bureau of Prisons employees who are responsible for the review of foreign language materials," and the "Mail Room officer will maintain a log of all publications mailed, indicating the item mailed, date mailed, and date returned."

But the warden never signed this version of MAR–5266.5C. Instead, the new policy that Warden Turner in fact signed (which the government has attached to its appellate brief, though it is not part of the record on appeal) is dated January 27, 1993 (and signed by Warden Turner on February 25, 1993). This policy is far less expansive than the version that the warden apparently rejected, saying only that to "ensure the security, dis-

---

2. While Kikumura pursued procedural due process, Eighth Amendment and Sixth Amendment theories before the district court, he has abandoned those claims on appeal.

cipline, and orderly operation of USP Marion, publications in a language other than English will be subject to translation, review, and verification which may cause a delay in receipt.... Publications which cannot be reasonably translated may be rejected." Though more restrictive than the earlier proposal, the enacted version of Institution Supplement MAR–5266.5C is of course far more expansive than the previous policy of summarily rejecting all Japanese language publications.

On January 22, 1993, Magistrate Judge Frazier issued a report and recommendation, recommending that the government's motion for summary judgment be granted. Kikumura raised objections to the report and recommendation, and the government filed a response to those objections with the district court on February 17, 1993. Significantly, the government attached to that reply the more expansive unsigned policy dated January 18, 1993, rather than the more restrictive policy, dated January 27, 1993 (which the warden ultimately signed on February 25, 1993). Whether the district court was led down the primrose path because the government's lawyers were careless, or worse, we of course cannot say. But the apparently misleading attachment is in any event unacceptable, and we should expect better.

### C

But the district court did not, in any event, rely on the government's misstatement of its policy, agreeing with the magistrate's conclusion that because prisoners have no "clearly established constitutional right" to receive mail in foreign languages, Warden Turner was entitled to qualified immunity.[3] The

court did not discuss Kikumura's equal protection claim, nor did it address his claims for injunctive or declaratory relief.[4]

### II.

■■ Government officials who are performing discretionary functions are immune from liability for civil damages unless they violate clearly established constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Elder v. Holloway*, —— U.S. ——, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). We agree with the district court that a prisoner's First Amendment right to receive mail in a language other than English is not clearly established.

Whatever we might think about the constitutionality of the warden's policy as an initial matter—a question we take up in examining Kikumura's claim for injunctive and declaratory relief—it surely is not "clearly established" that Warden Turner's actions violated Kikumura's constitutional rights. The only case closely on point that we have been able to discover is *Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo.1979), *aff'd in relevant part, set aside in part*, 639 F.2d 559, 581 (10th Cir. 1980), where a blanket policy of refusing to deliver mail in a language other than English (in that case, mostly Spanish) was deemed unconstitutional. But we do not think we can declare a matter "clearly established" based on the existence of one case from another circuit. This is especially true in light of the fact that since *Ramos*, the Supreme Court has allowed wardens greater leeway to limit inmates' constitutional rights where such restrictions are reasonably relat-

---

3. While the magistrate correctly characterized the suit for civil damages against a federal officer as a *Bivens* action, *see Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the district court erroneously referred to Kikumura's suit as a § 1983 claim, *see* Order (Mar. 15, 1993) at 6. Section 1983 provides a cause of action only against those acting "under color of *state* law."

4. The court did, however, adopt the magistrate's report and recommendation. That report (though the district court's opinion made no ref-

erence to this language) concluded that "Turner's rejection of incoming publications printed in Japanese was rationally related to legitimate penological interests and did not violate plaintiff's First Amendment rights." Report and Recommendation (Jan. 22, 1993) at 5. While the magistrate judge did not, in so concluding, make reference to Kikumura's claims for injunctive or declaratory relief, the implication of the magistrate's conclusion—that Kikumura's First Amendment rights were not violated—is that he is not entitled to such relief. The magistrate did not, however, address the equal protection claim.

ed to valid penological interests. *See Turner v. Safly,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459. As our discussion of Kikumura's claim for declaratory and injunctive relief (pages 597–99, below) demonstrates, this is a close question, and the point of qualified immunity and its "clearly established" requirement is that government officials are not, as a rule, liable for damages in close cases. We therefore affirm the district court's entry of summary judgment in favor of Warden Turner on Kikumura's claim for civil damages for violations of his First Amendment rights.

### III.

#### A

Though the district court noted that Kikumura sought injunctive and declaratory relief, it made no mention of those claims in its opinion. It did, however, adopt the magistrate's report and recommendation, which—without mentioning the effect on the claims for injunctive and declaratory relief—found the summary rejection of Japanese language publications to be permissible under the First Amendment. We can therefore infer that the district court, accepting the magistrate's conclusion that the policy satisfied *Thornburgh,* denied Kikumura's claims for injunctive and declaratory relief because he found the policy constitutionally permissible.

Kikumura on appeal objects to this conclusion. Our first question is whether the warden's subsequent adoption of a new policy, codified in Institution Supplement MAR–5266.5C, renders the matter moot. Kikumura insists that it is not, arguing that without declaratory and injunctive relief, there is nothing to stop the warden from going back to the old policy.

■ Determining whether an official's voluntary cessation from engaging in conduct challenged as unconstitutional renders a case moot calls for an exercise of judicial discretion. In general, "voluntary cessation of allegedly illegal conduct does not" render a

case moot, *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The Supreme Court has also said that the burden of proving mootness—which is on the defendant—"is a heavy one." *Id.* at 633, 73 S.Ct. at 897. *See also County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979).

■ As we have observed, were we to treat voluntary cessation as mooting a case, any government actor who is being sued "could cease a challenged practice to thwart the lawsuit, and then return to old tricks once the coast is clear." *Magnuson v. City of Hickory Hills,* 933 F.2d 562, 565 (7th Cir.1991). It is true, however, that when "the defendants are public officials ... we place greater stock in their acts of self-correction, as long as they appear genuine." *Id. See also Ragsdale v. Turnock,* 841 F.2d 1358, 1364–66 (7th Cir.1988).

But here we cannot conclude that the adoption of Institution Supplement MAR 5266.5C moots this case. As we have noted, Marion's policies regarding foreign language publications have apparently ebbed and flowed throughout the course of the litigation. Against this background, we are unable to find that the government has satisfied its "heavy burden" of proving that there is no reasonable likelihood that it will reinstitute the challenged policy.

#### B

That conclusion leaves us to review de novo the magistrate's conclusion, adopted by the district court, that the prison's policy was constitutionally permissible. Our resolution of the mootness question here requires us to determine whether Kikumura was entitled to injunctive or declaratory relief (or, more precisely, whether the government was entitled to summary judgment on those claims) as the situation stood on the day he filed his complaint. We therefore ask whether the prison's alleged de facto policy of summarily rejecting foreign language publications without making any effort to translate or screen such material [5] is constitutionally permissible.

---

**5.** The magistrate's report and recommendation

does note that translating the Japanese-language

In addressing that question, our discussion is narrowly limited to the regime we are reviewing: where a prison makes no effort at all to accommodate the constitutional rights of prisoners native in languages other than English. We therefore do not today have occasion to pass judgment whether any particular type of accommodation is either necessary or sufficient. We ask only whether the constitution allows the prison simply to deny a prisoner all foreign language publications.

In *Turner v. Safly*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987), the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." In particular, the Court pointed to four factors to channel the "reasonableness" inquiry:

> 1. There "must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* at 89, 107 S.Ct. at 2262 (internal quotation omitted).
> 2. "[W]hether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90, 107 S.Ct. at 2262.
> 3. "[T]he impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.*
> 4. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* (citation omitted).

Two years later, in *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459, the Court applied the *Turner* standard in evaluating the constitutionality of Bureau of Prisons' regulations regarding prisoners' mail. The gloss that *Thornburgh* puts on the *Turner* factors leads us to conclude that summary exclusion of foreign language materials is unconstitutional.

In examining the first factor, whether there is a rational connection between the regulation and the government's proffered interest, the Court emphasized the "individualized nature of the determinations required by the regulation." *Thornburgh*, 490 U.S. at 416, 109 S.Ct. at 1883. "Under the regulations, no publications may be excluded unless the warden himself makes the determination that it is 'detrimental to the security, good order, or discipline of the institution or ... might facilitate criminal activity.' ... Indeed, the regulations expressly reject certain shortcuts that would lead to needless exclusions." *Id.* at 416–17, 109 S.Ct. at 1883 (citation omitted).

In summarily excluding all Japanese-language publications, Warden Turner of course did not make the particularized finding on which the *Thornburgh* Court relied. This conclusion is unaffected by the warden's statement in the notice to Kikumura, rejecting such publications, that "I have determined that its entry into this institution could be detrimental to the security, good order and discipline of the institution. I have based this decision on the fact that these publications are printed in Japanese and, therefore, [cannot] be monitored or reviewed by institution staff." The rationale offered in the second sentence quoted belies the assertion made in the first. Warden Turner here obviously did not make an individualized determination about the danger posed by these materials, the type of determination that "comforted" the *Thornburgh* Court. 490 U.S. at 416, 109 S.Ct. at 1883. Rather, he rejected them precisely because he was unable to do so.

The second *Turner* factor is the existence of alternative means of exercising the right in question. Here, the right at issue is the right to receive information. On this point, the record points up a factual dispute regarding Kikumura's English abilities, which of

---

materials would be very expensive, Report and Recommendation at 5 & n. 4. But the practice that Kikumura was asking the court to enjoin and to declare unconstitutional is the practice in place *before* he brought suit—rejecting such material without even examining whether there were readily available means to screen it.

course affects the availability of alternative means for him to exercise his right to receive information. Kikumura argues that he was "functionally illiterate" at the time in question (on entering the prison, Kikumura's English reading abilities, as measured by the Adult Basic Learning Exam, were at the 2.8 grade level), while the government points to his relatively advanced vocabulary (11.7 grade level). *See also Kikumura,* 706 F.Supp. at 336 & n. 6 (discussing Kikumura's English abilities).

The third and fourth *Turner* factors look respectively to the cost of accommodating the constitutional right, and the existence of readily available alternatives that would accommodate the right. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262.

These factors counsel strongly in Kikumura's favor. The record here, read—as we must in view of the case's procedural posture—in the light most favorable to Kikumura, suggests that when Kikumura first filed suit, the prison was rejecting Japanese publications sent to him without making any effort at all to screen them, translate them, or locate someone who could do either of those things. In *Turner,* the Supreme Court explained that a restriction is likely to be constitutionally permissible where the alternatives to the restriction are costly and not immediately apparent. The obvious implication, then, is that a prison may not restrict a prisoner's rights without even looking to see how the rights might be accommodated and estimating the expense entailed by doing so.

In light of this, we believe that the district court on the record before it erred in granting the government's motion for summary judgment on Kikumura's claim for injunctive and declaratory relief.

---

6. *See Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (invalidating a state law, apparently on substantive due process grounds, prohibiting the teaching of German in schools); *Yu Cong Eng v. Trinidad,* 271 U.S. 500, 46 S.Ct. 619, 70 L.Ed. 1059 (1926) (striking down an ordinance prohibiting businesses from

## IV.

Kikumura also complains that the denial of Japanese language materials contravenes the Equal Protection Clause. Neither the magistrate nor the district court discussed this claim, though the government has responded to the argument on the merits, both before the district court and again on appeal.

The government's response to Kikumura's equal protection claim is that the regulations are non-discriminatory, since none of the prisoners at Marion are permitted to receive publications in Japanese. "The regulations at issue here concerning receipt of foreign publications applies to all inmates and treats all inmates alike." Br. at 22.

But this type of argument has been firmly rejected in the equal protection context. *See Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (rejecting the argument that anti-miscegenation laws, because they apply to members of all races, do not raise equal protection concerns). It also ignores the long-established equal protection methodology, which applies heightened scrutiny to classifications on the basis of one's membership in a protected class. The equal protection question presented by Kikumura's claim is therefore whether denying access to Japanese-language materials is a classification that discriminates based on Japanese nationality. Such laws, *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), teaches, are tolerated only in very unusual circumstances.

Whether classifications on the basis of language are to be treated as classifications on the basis of national origin is an unsettled question. There are exceedingly few Supreme Court opinions addressing the rights of language minorities,[6] and the matter was expressly left open by the Court's recent opinion in *Hernandez v. New York,* 500 U.S.

keeping records in a language other than English, Spanish, or local Phillipine dialects); *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (finding that placing non-English speakers in an English classroom without assistance was a form of national-origin discrimination in violation of Title VI).

**600**

352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).[7] The Court there found that the prohibition on race-based peremptory challenges, set out in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was not violated by a prosecutor's exclusion of Spanish-speaking Latinos from a jury, on the theory that they might themselves translate the testimony of Spanish-speaking witnesses, rather than rely on a court interpreter's translation. In so holding, the Court noted that "we do not resolve the more difficult question of the breadth with which the concept of race should be defined for equal protection purposes.... It may well be, for certain ethnic groups and in some communities, that proficiency in a particular language, like skin color, should be treated as a surrogate for race under an equal protection analysis." *Hernandez,* 500 U.S. at 369–70, 111 S.Ct. at 1872–73. *See also* Bill Piatt, *¿Only English?: Law and Language Policy in the United States* (1990); Note, *"Official English": Federal Limits on Efforts to Curtail Bilingual Services in the States,* 100 Harv.L.Rev. 1345, 1352–61 (1987) (arguing for heightened scrutiny for laws that discriminate against language minorities).

Of course, even if there is an underlying constitutional right, a policy infringing that right might very well be permissible in the prison context by application of the *Turner* considerations. We will not at this point, without the benefit of the district court's consideration, attempt to pass further judgment on the matter. And here, too, we are addressing only the pre-litigation situation at Marion where apparently avenues of accommodation of the various interests were not being pursued. The question should instead be taken up by the district court on remand.

### V.

For the reasons stated above, the entry of summary judgment in favor of Warden Turner on the claims for damages is AFFIRMED. The entry of summary judgment on Kikumura's claims for injunctive and declaratory relief, both on the First Amendment and equal

protection theories, is VACATED, and the matter REMANDED to the district court for further proceedings consistent with this opinion. The parties are to bear their own costs in this appeal.

---

7. This of course means that Warden Turner, in light of his qualified immunity, may not be held personally liable for civil damages on this basis.