Jay C. MAGNUSON and Margaret L. Magnuson, individually and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

The CITY OF HICKORY HILLS, a municipal corporation; Vydas Juskelis, individually and in his official capacity as Director of Public Works and Superintendent of the Sewer Department of the City of Hickory Hills; and Raymond Kay, in his official capacity as Mayor of the City of Hickory Hills, Defendants–Appellees.

No. 90–1370.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1990.

Decided May 29, 1991.

Joel D. Berger, Chicago, Ill., for plaintiffs-appellants.

Michael G. Cainkar, Vincent Cainkar, Chicago, Ill., for defendants-appellees.

Before BAUER, Chief Judge, and POSNER, and RIPPLE, Circuit Judges.

BAUER, Chief Judge.

"And Noah he often said to his wife
    when he sat down to dine,
I don't care where the water goes if it
    doesn't get into the wine."

    G.K. Chesterton, *Wine and Water*

It didn't matter much to Noah, but Hickory Hills, Illinois, cares very much where the water goes. The Chicago suburb maintains two separate sewer systems, one for storm water and the other for sanitary waste. Residents having homes with basements, half-basements, crawl spaces, and overhead sewers are required to install two sump pumps: one to handle sanitary waste and another to collect and divert storm water coming from gutters, window wells, floor drains, and drain tiles. Without the additional pump, storm water from these parts of the house flows into the sanitary waste sewer system, causing back-ups and flooding. Despite an ordinance banning the connection of "storm water" sump pumps to the sanitary sewer system, the City still had a problem with property owners whose illegal hook-ups posed a potential flooding hazard.

In addition to flood prevention, Hickory Hills had another reason for wanting to pull the plug on sump pump violators. Pursuant to The Clean Water Act of 1972, 33 U.S.C. §§ 1251–1387, the Metropolitan Sanitary District of Greater Chicago ("MSD") (now called the Metropolitan Water Reclamation District of Greater Chicago) enacted comprehensive legislation requiring all municipalities under its jurisdiction (including Hickory Hills) to make deliberate efforts to eradicate the overloading of local sanitary sewer systems. To effectuate this goal, the MSD sued towns who failed to undertake or complete a sewer repair program. In an effort to comply with the MSD's mandate, Hickory Hills adopted a sewer rehabilitation program to abate the hazards caused by the infiltration of storm and ground water into the sanitary sewer system. Part of the City's strategy was to institute house-to-house inspections to "flush out" potential sources of illegal discharge into the sanitary sewer system.

On April 1 (all these events occurred in 1988), the Hickory Hills Department of Public Works mailed approximately 1200 letters to homeowners informing them that they had been identified as sources of illegal storm or ground water infiltration into the City's sanitary sewer system. The letter urged these property owners to correct all gutter/downspouts and sump pump violations. They were advised to come to the Department to pick up a free permit to make the required corrections and a list of approved, bonded plumbing contractors. In bold print, the letter stated that, "after

July 1, 1988, any property owner not correcting violations will receive a final notice warning you that the City will go to court to enforce its ordinances and levy a fine against you and that the City will shut off water service to your property."

As part of the inspection program, Hickory Hills checked the home of Jay C. and Margaret L. Magnuson for possible sump pump violations. According to the Magnusons, they were told that their home passed muster, so when the April 1 warning letter came to their door, they ignored it. The City sent out a "Second Violations Notice—Water Termination Service Notice" on June 27. This letter warned,

> If you ignore this letter, if you fail to have an inspection for property which is in compliance, or if you fail to make the required corrections, your water service will be terminated on or after September 1, 1988. By law the City is not required to serve any further notice on you prior to termination of water service. If you feel that the City has made a mistake, or if there are mitigating circumstances which make compliance impossible by September 1, 1988, you have the right to request a hearing before September 1, 1988 by sending a written letter to the Department of Public Water Works....

Again, the Magnusons made no attempt to contact the City or request a hearing. The City mailed yet another notice on August 26. It essentially repeated the information contained in the prior notices. As they did twice before, the Magnusons received the notice, ignored it, and failed to make any attempt to contact the City to refute the charge that they were in violation of the sewer rehabilitation program.

Shortly after they received the third notice, the Magnusons had other, unrelated plumbing repairs performed on their home. In light of the fact that they were about to have their water service terminated, the Magnusons asked the plumber to inspect their home and make any repairs necessary for compliance with the sewer rehabilitation program. The Magnusons then contacted the City and scheduled a compliance inspection for September 23, which they later canceled. On November 8, the City affixed a water termination notice to the Magnusons' front door. City workers scraped it off two days later. Subsequently, the Magnusons canceled a second compliance inspection of their home that they had scheduled for November 16. They still feared that they could have their water shut off, so they filed suit on November 18 to obtain a temporary restraining order. On November 21, the plumber who had performed repairs on the Magnuson home notified Hickory Hills that the residence complied with the sewer rehabilitation program. The City took the Magnusons off the list of residents who were under threat of having their water cut off as a result of having an illegal source of storm water infiltration into the sanitary sewer system. The Magnusons never again were threatened with the termination of their water service pursuant to the sewer rehabilitation program.

■ Nevertheless, they filed a claim under 42 U.S.C. § 1983 in federal district court against the City of Hickory Hills, its mayor, and the director of the sewer department (collectively the "City"). The complaint alleged that the City had violated the Magnusons' fourth amendment right to be free from unreasonable searches and seizures, their procedural due process rights under the fifth, ninth and fourteenth amendments, and their right to substantive due process. The Magnusons sought injunctive and declaratory relief as well as compensatory and punitive damages. In addition, they sought to certify a class of similarly situated plaintiffs. Both sides filed motions for summary judgment. The district court denied the Magnusons' motion for class certification, dismissed their claims for injunctive and declaratory relief as moot, and granted the City's motion for summary judgment. *Magnuson v. City of Hickory Hills*, 730 F.Supp. 1439, 1444 (N.D.Ill.1990). It is from that judgment that the Magnusons now appeal. As with all summary judgment determinations, we review the matter *de novo* to determine whether the record as a whole establishes that the defendants were entitled to judgment as a matter of law. *See, e.g., Dieck-*

*hoff v. Severson,* 915 F.2d 1145, 1148 (7th Cir.1990).

The district court held that, because the Magnusons no longer were under the threat of having their water service terminated, their case was, so to speak, down the tubes. The Magnusons disagree that the matter was mooted by their eventual compliance with the sewer rehabilitation program. Describing the City's conduct as just the "first wave," they argue that, even though the City may not send them a threatening notice ever again, it will continue to send out intimidating notices to gain entry into the homes of other Hickory Hills residents.

■ The fact that the City voluntarily has stopped sending the Magnusons threatening notices does not by itself moot the controversy and deprive us of the power to determine the legality of the practice. *See City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074–75, 71 L.Ed.2d 152 (1982). If so, then any § 1983 defendant voluntarily could cease a challenged practice to thwart the lawsuit, and then return to old tricks once the coast is clear. *See United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). When the defendants are public officials, however, we place greater stock in their acts of self-correction, so long as they appear genuine. *Ragsdale v. Turnock,* 841 F.2d 1358, 1365 (7th Cir.1988), *later proceeding,* 734 F.Supp. 1457 (N.D.Ill.1990). The crucial inquiry is "whether there has been complete discontinuance, whether effects continue after discontinuance, and whether there is any other reason that justifies decision and relief." C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure: Jurisdiction* 2d § 3533.6, at 350.

■ With these principles in mind, we conclude that the Magnusons' challenge to Hickory Hills' sewer rehabilitation program is indeed moot. There is no evidence to show that the Magnusons have a reasonable expectation that the City will repeat its purportedly illegal actions, *see Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975), or

that they are suffering some residual ill effect from the (now-abated) threat that their water service may be terminated. *See County of Los Angeles v. Davis,* 440 U.S. 625, 633, 99 S.Ct. 1379, 1384, 59 L.Ed.2d 642 (1979). Rather, the record indicates that they face no future danger of having their water cut off, because they now comply with the sewer rehabilitation program.

■ The requirement that a justiciable controversy exists applies both to actions requesting a declaratory judgment and those seeking equitable relief. *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1936). To maintain a claim for injunctive relief in federal court, the plaintiff must do more than merely speculate that he again will experience injury as the result of a particular practice. *Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1982). Before a federal court will assume jurisdiction, the plaintiff "must allege some threatened or actual injury resulting from the putatively illegal action...." *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). At the time they filed suit, the Magnusons' grievances with the City existed only in the abstract. Because their claim is moot, they may not represent a class of Hickory Hills citizens who face the threat of having their water terminated due to noncompliance with the City's sewer rehabilitation program. *See O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1973) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."). *See also Robinson v. City of Chicago,* 868 F.2d 959, 968 (7th Cir.1989).

■ The Magnusons also raise assorted constitutional challenges. They first argue that the defendants violated property owners' fourth amendment rights by threatening them with the loss of water services in order to enter their homes. There may have been some Hickory Hills residents

who, when faced with the choice of consenting to a warrantless inspection or having their water terminated, opted for the former. However, the Magnusons may not assert these citizens' rights vicariously. *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969) (fourth amendment claim may be raised only by those whose rights were violated by the search itself). As to their individual fourth amendment claim, the Magnusons fare no better. The fourth amendment protects private citizens from unreasonable searches and seizures by the government. One of its goals is to protect privacy against arbitrary invasion. *United States v. Ortiz,* 422 U.S. 891, 896, 95 S.Ct. 2585, 2588–89, 45 L.Ed.2d 623 (1975). The Magnusons did not suffer an invasion of privacy because their home never was searched. Even if one views the City's placement of a water termination notice on the front door as a "seizure," it is not an unreasonable one. One court has pronounced as reasonable a far more intrusive device: the "Denver boot" placed on motor vehicles whose owners have outstanding traffic violation notices. *See Grant v. City of Chicago,* 594 F.Supp. 1441, 1451 (N.D.Ill.1984). *Cf. Saukstelis, et al. v. City of Chicago,* 932 F.2d 1171, 1174 (7th Cir.1991) (Denver boot does not violate due process).

■ Also meritless is the Magnusons' theory that the City violated their rights to procedural and substantive due process. According to them, the four notices were inconsistent, so that it was impossible to know upon which to rely. They further posit that the hearings described in the notices were nothing more than "unguided, and unauthorized meetings between suspect, prosecutor, and aldermen who had already made up their minds...." Appellants' Brief at 30. Finally, they argue that there was insufficient time provided to respond to the notices.

In any § 1983 action, the plaintiff must prove that the conduct complained of was committed under color of state law and that "this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In order for us to determine if there has been a due process violation, we first must ask if there has been a deprivation of a constitutionally protected liberty or property interest. *Board of Regents v. Roth,* 408 U.S. 564, 572–78, 92 S.Ct. 2701, 2706–10, 33 L.Ed.2d 548 (1971). Only then do we proceed to consider whether the defendant observed elemental due process safeguards, including notice and a hearing. *Gaballah v. Johnson,* 629 F.2d 1191, 1202 (7th Cir. 1980).

We need not address any of the Magnusons' concerns regarding the inadequacy of the procedures associated with the City's sewer rehabilitation program because they have failed to allege that they were deprived of a constitutionally protected liberty or property interest. In the absence of such an allegation, the Magnusons cannot pin their hopes on a catalogue of complaints regarding the City's compliance proceedings, particularly when their actions revealed that they obviously understood the import of the four (including the sticker on the door) notices they received and their right to a pretermination hearing.

■ The Magnusons' challenges under the fifth and ninth amendments warrant no discussion. Suffice it to say that we agree with the district court that the Magnusons have no claim under either amendment. As to the substantive due process claim, no plausible grounds support the notion that the City's sewer rehabilitation program violated any of the Magnusons' fundamental rights. In addition to their now-familiar objection to the warning notices, the Magnusons maintain that the inspection program and hearings were conducted in a willy-nilly fashion without established guidelines or rules. Neither of these arguments holds water. While claiming the notices were deficient, the Magnusons effected the necessary repairs and were in compliance with the sewer rehabilitation

program approximately two months before filing their lawsuit. They understood their right to a hearing and scheduled two of them, but did not take advantage of either one to show their compliance. Most importantly, they failed to allege that the City's notice, inspection, and hearing scheme caused them to suffer any injury.

█ The Magnusons raise two other complaints and, again, they are in over their heads. First, they contend that the sewer rehabilitation program neither is authorized by state law nor promulgated by ordinance. Even if we assume that to be the case, the program is not an unconstitutional abuse of power implicating substantive due process concerns. In *Archie v. City of Racine,* 847 F.2d 1211, 1218 (7th Cir.1988), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989), a § 1983 action that arose out of a death that resulted from a fire department dispatcher's refusal to send out a rescue squad, we determined that states may enforce, alter, or disregard state law so far as the Due Process Clause is concerned. It is not the role of federal courts to inform states how to enforce their own laws.

█ Second, the Magnusons assert that the termination of water service bears no rational relationship to the problem the City wishes to remedy. They argue that shutting off residents' water would do nothing to prevent rainwater—the major source of flooding—from entering the sewer system. The Magnusons may be right in theorizing that there exist better ways to shore up the flooding problem in Hickory Hills. A perfect "fit" between the problem and the remedy, however, is not required. When rights of a fundamental nature are involved, regulation limiting these rights may be justified only by a compelling state interest. *See Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1972). We do not consider the right to continued municipal water service such a fundamental right; therefore, all that is required is that there be a reasonable relationship between the continued water service and the conditions imposed by the City. We will strike down the conduct in question only if it is "arbitrary and unreasonable bearing no substantial relationship to the public health, safety or welfare." *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). *See also Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 467 (7th Cir. 1988); *Burrell v. City of Kankakee,* 815 F.2d 1127, 1129 (7th Cir.1987).

Here, the conduct complained of is neither arbitrary nor unreasonable. It was directed toward a legitimate goal related to public health and safety. The City could use the threat of water service termination in order to insure the success of the sewer rehabilitation program, a program aimed at complying with legislation requiring all municipalities under MSD jurisdiction to make deliberate efforts to eradicate the overloading of local sanitary sewer systems. The California Supreme Court has held constitutional a scheme in which a municipality could turn off water services to a resident who refused to pay for garbage disposal. *See Perez v. San Bruno,* 27 Cal.3d 875, 892, 616 P.2d 1287, 1296, 168 Cal.Rptr. 114, 123 (1980). *See generally,* Annotation, *Right of Municipality to Refuse Services Provided by It to Resident for Failure by Resident to Pay for Other Unrelated Services,* 60 A.L.R.3d 714 (1974). The case for cutting off water service for failure to comply with a sewer rehabilitation program is even more compelling, because the two services are fundamentally interdependent. Common sense informs us that any decrease in the flow of tap water necessarily would diminish the amount of water entering the sewer system. Because the Magnusons have failed to come forward with any credible evidence showing that the City's program is arbitrary or unreasonable, their substantive due process claim fails.

With arguments and challenges like these, the Magnusons' appeal was destined to go down the drain. The opinion and order of the district court is, in all aspects,

AFFIRMED.