**MANNINGTON MILLS, INC., Plaintiff,**

v.

**Robert C. SHINN, Jr., et al., Defendants.**

**Civ. A. No. 94–736 (JEI).**

United States District Court,
D. New Jersey.

Feb. 28, 1995.

924

Peter M. Dolinger, Marlton, NJ, for plaintiff.

Deborah T. Poritz, Atty. Gen. of New Jersey by Jane F. Engel, Deputy Atty. Gen., Trenton, NJ, for defendants.

## OPINION

IRENAS, District Judge:

Plaintiff Mannington Mills, Inc. ("Mannington"), a manufacturer of vinyl flooring, operates a 325–acre manufacturing facility in Mannington Township, Salem County, New Jersey (the "Mannington site"). Defendants, officials of the New Jersey Department of Environmental Protection and Energy ("DEPE"),[1] are sued in both their individual and official capacities.

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants used "secret state government proceedings and other arbitrary and unlawful actions to deprive the plaintiff of liberty and property" in violation of its rights to procedural and substantive due process, as well as equal protection. (Complaint at ¶ 1.) The complaint also alleges that defendants conspired to violate these rights in violation of 42 U.S.C. § 1985(3) and seeks declaratory and injunctive relief, compensatory damages, and attorney's fees pursuant to 42 U.S.C. § 1988.

Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, arguing that plaintiff's claims are moot, that we should abstain from deciding them, and that defendants enjoy qualified immunity from suit. We find that plaintiff's requests for declaratory and injunctive relief are moot and therefore dismiss them without prejudice for lack of subject matter jurisdiction. In the alternative, we would abstain from deciding these claims. Plaintiff's claim for monetary damages is barred by the doctrine of qualified immunity.

---

1. Defendant Robert C. Shinn, Jr. is the Commissioner of DEPE, defendant Lance Miller is the Assistant Commissioner for Site Remediation, defendant Karl Delaney is the Director of the Division of Responsible Party Site Remediation, defendant Ronald Corcory is the Assistant Director of Responsible Party Cleanup, Defendant Linda Grayson is the Chief of the Bureau of State Case Management, and defendant Colleen Kokas is the Section Chief of the Bureau of State Case Management. (Complaint at ¶ 4.)

## I. LEGAL STANDARD

The standard for a Rule 12(b)(6) motion is familiar: in considering such a motion, the court must accept all allegations of the complaint as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). However, when "[c]onfronted with [a Rule 12(b)(6) ] motion, the court must review the allegations of *fact* contained in the complaint; for this purpose the court does not consider conclusory recitations of law." *Commonwealth of Pennsylvania, ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 179 (3d Cir.1988) (emphasis added).

Similarly, when a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction attacks a complaint on its face, with no supporting documents or affidavits, the court must consider the allegations in the complaint as true. *Yuksel v. Northern Am. Power Tech., Inc.*, 805 F.Supp. 310, 311 (E.D.Pa. 1992) (citing *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). Thus, in deciding whether subsequent events have rendered the allegations in the complaint moot, or whether we should abstain from addressing those allegations, we accept as true the facts alleged in the complaint.

## II. BACKGROUND

Plaintiff's allegations arise from DEPE's efforts to implement its Site Remediation Program ("SRP"). On June 12, 1992, plaintiff received a letter from DEPE charging plaintiff with the release of "hazardous substances" at the Mannington site. (Complaint at ¶ 6.) The letter gave plaintiff sixty days to enter into a "Memorandum of Agreement" (MOA) with DEPE under which plaintiff would "conduct remedial activities." (*Id.*) Although the letter itself did not identify the specific hazardous substance involved, plaintiff later learned that DEPE's concerns stemmed from alleged soil contamination in plaintiff's hazardous drum storage area.

(Complaint at ¶ 8.) Plaintiff further alleges that this letter was sent as a precursor to the SRP, which was initiated by defendant Miller with the assistance of defendant Delaney "and other defendants." (Complaint at ¶ 7.)

In response, plaintiff provided DEPE with a May 26, 1992, "deregulation letter" DEPE had issued in conjunction with plaintiff's withdrawal of an application for a hazardous waste storage permit. This letter expressed satisfaction with the removal of contaminated soil from the Mannington site. (Complaint at ¶ 9.) When plaintiff brought this letter to DEPE's attention, DEPE agreed to extend the time to respond to the MOA. (Complaint at ¶ 10.)

On February 18, 1993, defendant Kokas wrote plaintiff and stated that it would be "necessary" for DEPE investigate the Mannington site and to implement a remediation program. (Complaint at ¶ 11.) This letter identified neither specific contaminants nor the specific statutes or regulations allegedly violated. (Complaint at ¶¶ 12–13.) Kokas offered plaintiff an opportunity to enter into an administrative consent order ("ACO") to avoid "enforcement actions" by DEPE. (Complaint at ¶ 14.)

Plaintiff subsequently learned that this letter was motivated not by concerns over soil contamination but by ground water contamination indicated in a report prepared by NUS Corp. (the "NUS report"). (Complaint at ¶¶ 15–16.) Although plaintiff disputed the contents of the NUS report, it nonetheless offered to assume voluntary monitoring. (Complaint at ¶¶ 17–18.) DEPE agreed that some of the NUS report was unreliable but, relying on the level of chlorinated solvents revealed by plaintiff's own voluntary ground water monitoring, refused to withdraw the demand that plaintiff sign an ACO. (Complaint at ¶ 21.) On May 11, 1993, plaintiff disputed the use of this data and requested a meeting with defendants. (Complaint at ¶ 22.)

On May 17, 1993, DEPE published a regulation requiring sites designated as "priorities" to investigate and remediate pursuant to a standard ACO. 25 *N.J.Reg.* 2002. On May 19, 1993, DEPE advised plaintiff that

the Mannington site had been designated a priority and that if it did not sign the standard ACO it would face an investigation, cleanup, and cost recovery action. (Complaint at ¶ 23.)

During subsequent conversations plaintiff learned that DEPE's concerns had once again turned to soil contaminants in the drum storage area. (Complaint at ¶ 25.) Plaintiff again referred to the deregulation letter and complained that DEPE had thrice shifted the basis for its proposed remediation program: from the drum storage area, to the NUS report, to plaintiff's own ground water monitoring, and back to the drum storage area. (Complaint at ¶ 26.) On July 12, 1993, DEPE responded that it "reserves the right to make the sole determination of whether or not a site is a priority, and in this case the Site is a priority." (Complaint at ¶ 27.) This letter threatened a lawsuit for multiple damages if plaintiff did not sign the standard ACO. (Complaint at ¶ 28.)

On August 16, 1993, plaintiff protested that "DEPE has been unclear as to what findings or data are raising environmental concerns" and again requested a meeting. (Complaint at ¶ 30.) On September 14, 1993, defendant Kokas responded that the "priority determination is due to groundwater, surface water and soil contamination attributed to discharges from Mannington's operations at the Site." (Complaint at ¶ 31.) The letter declined to disclose how DEPE made the priority determination because that information was "confidential at this time." (*Id.*)

On October 5, 1993, defendants Grayson and Kokas met with plaintiff's representatives and agreed to allow plaintiff to review all DEPE files on the Mannington site. (Complaint at ¶ 33.) They also indicated that a draft of a Remedial Priority System (RPS) used to determine what sites would be designated as "priorities" would be available in approximately six months. (Complaint at ¶ 34.) Finally, while defendants were still unclear about what factors led to plaintiff's priority determination, they did state that the arsenic level in the ground water was not a primary concern. (Complaint at ¶ 35.)

In a letter dated October 19, 1993, Grayson and Kokas indicated that DEPE would provide plaintiff with a copy of the RPS when it became available in approximately six months, even thought the availability of the RPS had been announced in the *New Jersey Register* on October 4, 1993. 25 *N.J.Reg.* 4551(c). This letter also recanted defendants' earlier representation that plaintiff's priority listing was not based on arsenic levels in the ground water. (Complaint at ¶¶ 36, 38.)

In letters dated November 4 and 11, 1993, plaintiff pointed to deficiencies in the draft RPS and argued that its own review of the DEPE files and its own ground water monitoring left plaintiff unconvinced that it should remain on the priority list. Plaintiff also requested another meeting with DEPE representatives. (Complaint at ¶¶ 39, 41–42.) However, on November 19, 1993, Kokas stated in a telephone conversation that the priority determination for the Mannington site "was final" and that DEPE would begin to investigate remediation. (Complaint at ¶ 43.) This determination was "based on arsenic in two media and on chlorinated solvents in another." (*Id.*)

On January 21, 1994, plaintiff wrote to Grayson objecting to the inclusion of the Mannington site on the list of sixty-one priority sites which Corcory had published on January 3, 1993. 26 *N.J.Reg.* 259(c). This letter also provided DEPE with a report generated by plaintiff's voluntary monitoring activities showing no evidence of chlorinated solvents and inconclusive evidence of arsenic in the ground water. (Complaint at ¶ 45.)

On February 16, 1994, plaintiff filed (i) the complaint in this litigation; (ii) a Notice of Appeal with the Appellate Division of the New Jersey Superior Court, No. A–3175–93T3, challenging DEPE's priority designation of the Mannington site, *see N.J.R.* 2:2–3(a)(2) (appeal as of right to the Appellate Division "to review final decisions or actions of any state administrative agency or officer"); and (iii) a Notice of Intent to Commence Action against the DEPE in the Law Division of the Superior Court, No. SLM–C–8–94, pursuant to the New Jersey Environmental Rights Act, *N.J.S.A.* § 2A:35A–1. The Law Division dismissed the Notice of

Intent with prejudice on October 26, 1994, and the Appellate Division dismissed the Notice of Appeal as moot on December 14, 1994.

On February 23, 1994, plaintiff received a letter indicating that DEPE had made its initial priority determinations, including the prioritization of the Mannington site, "on a case by case basis" rather than under the RPS. (Complaint at ¶ 48.) However, on April 4, 1994, plaintiff received two "scoring sheets" purportedly used by DEPE to determine the Mannington site's priority status. (Complaint at ¶ 50.) Plaintiff argues that these scores vary widely, evidencing either arbitrary and capricious action by the state or a subterfuge for the state's true motive—plaintiff's status as a "deep pocket." (Complaint at ¶¶ 51–57.)

After having solicited public comment on October 4, 1993, 25 *N.J.Reg.* 4551(c), DEPE withdrew the list of priority sites on September 6, 1994, in order to review those comments. Pending the new scoring system, sites originally designated as a priority could begin remediation through an MOA, 26 *N.J.Reg.* 3753(b). *See N.J.A.C.* § 7:26C.

## III. DISCUSSION

Initially, we must define exactly what state action plaintiff challenges. Plaintiff's complaint does not directly put in issue whether the Mannington site might properly be designated as a "priority" for immediate remedial action—a determination appropriately left to state law. Rather, we are called upon to judge whether the means used by New Jersey to reach this determination violated plaintiff's constitutional rights. Defendants argue that (i) this question is moot, (ii) the court should abstain from deciding it, and (iii) the defendants are protected from any poten-

tial liability by the doctrine of qualified immunity.

### A. Mootness

Defendants argue that DEPE's withdrawal of the list of priority sites has rendered this controversy moot. Article III of the United States Constitution limits the federal courts' jurisdiction to "actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990). Therefore, to invoke federal jurisdiction, "a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id.* The Third Circuit has held that a case becomes moot if: (i) the alleged violation has ceased, and there is no reasonable expectation that it will recur; and (ii) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. *New Jersey Turnpike Auth. v. Jersey Cent. Power*, 772 F.2d 25, 31 (3d Cir.1985).

Because the redressibility of the alleged injury is an important factor in the mootness inquiry, *see Lewis*, 494 U.S. at 477, 110 S.Ct. at 1253, we will address plaintiff's claims in terms of the type of relief requested. First, plaintiff requests prospective relief in the form of an injunction and a declaratory judgment. Second, plaintiff seeks retrospective relief in the form of compensatory damages.[2]

#### 1. *Prospective relief*

Plaintiff seeks three types of prospective relief: (i) a declaration "that defendants' past and present government regulation and enforcement against Mannington violates Mannington's rights;" (ii) an injunction prohibiting "further constitutional and statutory violations;" and (iii) an injunction prohibiting

---

**2.** We note that the Appellate Division of the New Jersey Superior Court has already held plaintiff's Notice of Appeal moot. If that case raised the same issues as those currently before this court, the doctrine of issue preclusion would require us to find plaintiff's claim moot. Furthermore, the New Jersey "entire controversy" doctrine would require us to follow the Appellate Division's findings not only on those issues actually raised, but any issue that could have been raised before the Appellate Division. *See Petrocelli v. Daniel Woodhead Co.*, 993 F.2d 27, 29 (3d Cir.1993)

(applying New Jersey entire controversy doctrine in federal court).

However, plaintiff's Notice of Appeal before the Appellate Division apparently challenged only the RPS itself and not the constitutionality of the means utilized in making the priority determination. Furthermore, because the action was brought directly before the Appellate Division under *N.J.R.* 2:2–3(a)(2), plaintiff may not have had an opportunity to present those claims in that action. Therefore, we will not give the Appellate Division's decision preclusive effect.

defendants from entering the Mannington site. (Complaint at 20–21.) We find that all three requests for prospective relief are moot.

It is " 'well settled' " that " 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' " *Northeastern Fla. Contractors v. Jacksonville,* —— U.S. ——, ——, 113 S.Ct. 2297, 2301, 124 L.Ed.2d 586 (1993) (quoting *City of Mesquite v. Aladdin's Castle Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074–75, 71 L.Ed.2d 152 (1982)). Cases that "concern the propriety of a[n agency] regulation or practice, *i.e.,* a position of general regulatory significance that the agency could reassert at will," will not be rendered moot under this doctrine. *State of New Jersey v. Heldor Indus., Inc.,* 989 F.2d 702, 707–08 (3d Cir.1993) (citing *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)).

Thus, the Third Circuit has found that various challenges to regulatory practices are not moot where the agency withdraws current enforcement proceedings but retains the right to renew these proceedings in the future. *See Solar Turbines Inc. v. Seif,* 879 F.2d 1073, 1078–79 (3d Cir.1989); *Phillips v. Pennsylvania Higher Educ. Assistance Agency,* 657 F.2d 554, 569–70 (3d Cir.1981), *cert. denied,* 455 U.S. 924, 102 S.Ct. 1284, 71 L.Ed.2d 466 (1982); *Dow Chem. Co. v. EPA,* 605 F.2d 673, 678–79 (3d Cir.1979). For example, in *Dow Chemical* the EPA withdrew a rule but "insist[ed] that the regulation was within its statutory authority and that it was revoked solely because of procedural irregularities." 605 F.2d at 677. The court therefore found that the case was not moot because the EPA could simply comply with the mandated procedures and repromulgate the same rule. *Id.* at 678.

Nonetheless, the agency's withdrawal of the regulation at issue is "an important factor" to consider in determining whether a case is moot. *City of Mesquite,* 455 U.S. at 289, 102 S.Ct. at 1074–75. Where discontinued official action is at issue, the court must consider "whether there has been complete discontinuance, whether effects continue after discontinuance, and whether there is any other reason that justifies decision and relief." 13A Charles A. Wright et al., *Federal Practice and Procedure* § 3533.7, at 350 (2d ed. 1984).

■ Under this standard, plaintiff's request for an injunction preventing DEPE from entering the Mannington site is moot. In *Dow Chemical,* the Third Circuit found that the if the EPA had "withdrawn the rule because it was uncertain as to its statutory authority ... the case might have been rendered non-justiciable." 605 F.2d at 678. In this case, DEPE withdrew the RPS to review the method of scoring priority sites. Plaintiff does not seek an injunction preventing DEPE from re-listing Mannington as a "priority" site, but rather seeks to prevent DEPE from entering the property pursuant to an arbitrary and capricious scoring system. A court cannot, however, determine whether the new scoring system is arbitrary and capricious until it is promulgated. Therefore, the withdrawal of the previous RPS for substantive review, rather than procedural minutiae, moots plaintiff's claim for prospective relief. *See also Levin v. Harleston,* 966 F.2d 85, 90 (2d Cir.1992) (where disciplinary proceedings had ceased, there was no "real and imminent threat" to plaintiff's rights, and injunctive relief was unwarranted); *Magnuson v. City of Hickory Hills,* 933 F.2d 562, 565 (7th Cir.1991) (claim for injunctive relief moot where municipality had abandoned policy that could lead to termination of water service).[3]

---

3. Plaintiff cites both *Levin* and *Magnuson* as examples where cessation of state action did not render a case moot. (Plaintiff's Brief at 11, n. 27.) While the *Levin* court technically held that injunctive relief in that case was not moot, 966 F.2d at 89, it nonetheless concluded that there was no "real and imminent threat" that the harmful activity would resume, making injunctive relief inappropriate. *Id.* Plaintiff's complaint fails to meet this requirement, regardless of whether phrased as a principle of mootness or an element of injunctive relief. Insofar as plaintiff relies on *Magnuson,* that case goes squarely against plaintiff's position. *See* 933 F.2d at 565 ("we conclude that the Magnuson's challenge to [the] sewer rehabilitation program is indeed moot.").

Plaintiff also seeks a declaration that defendants' "past and present" actions violated its rights and an injunction prohibiting further violations. Broad-based "obey the law" injunctive relief is generally prohibited. *See* 11 Wright & Miller, *Federal Practice & Procedure* § 2955, at 537; Fed.R.Civ.P. 65(d). Until DEPE actually implements the SRP by designating a list of priority sites and commencing enforcement action, it is simply impossible to anticipate whether there will be any state action which runs afoul of constitutional mandates. Assuming, *arguendo,* that DEPE acted unconstitutionally in its initial efforts to implement the SRP, there is no "real and imminent threat" that DEPE will repeat its errors now that it has withdrawn the list of priority sites.

Similarly, while a request for declaratory relief may sometimes survive when injunctive relief has become moot, *Levin,* 966 F.2d at 90, this holds true only when the declaration addresses specific conduct violative of a specific right. For instance, in *Levin,* the court found that "[a] declaration that disciplinary proceedings, or the threat thereof, predicated solely upon Levin's continued expression of his views outside the classroom violates his First Amendment rights will clarify the relations between the parties and eliminate the legal uncertainties that gave rise to this litigation." 966 F.2d at 90. This court, however, cannot define the legal relationship between the parties here because that relationship will not be determined until DEPE promulgates a new RPS. A declaration that DEPE may not do so in an unconstitutional manner would merely restate the obvious.

### 2. *Retrospective relief*

Having ruled that injunctive and declaratory relief are unavailable to the plaintiff, we now turn to plaintiff's claim for money damages for actions already taken by defendants. Eleventh Amendment immunity insulates states from damage claims in federal courts, but does not protect state officials from suits for damages against them in their individual capacities. *Hafer v. Melo,* 502 U.S. 21, 25–29, 112 S.Ct. 358, 362–63, 116 L.Ed.2d 301 (1991). Because any damage which has already occurred cannot be cured by mere discontinuance of the official action at issue, a damage claim usually will not become moot. *National Iranian Oil Co. v. Mapco Int'l, Inc.,* 983 F.2d 485, 489 (3d Cir.1992). Thus, plaintiff's claims for damages are not moot, and it may maintain those claims against defendants in their individual capacities.

### B. Abstention

Defendants also ask that the court abstain from deciding this case on the basis of the doctrines announced in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) and *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). We find that *Burford* abstention provides an alternative ground for dismissal of plaintiff's claims for prospective relief but does not dispose of its damages claim. We also find that *Pullman* abstention does not apply to the facts of this case.

### 1. *Burford Abstention*

In *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the Court held that where a complicated regulatory scheme is at issue, "a sound respect for the independence of state action requires the federal equity court to stay its hand." 319 U.S. at 334, 63 S.Ct. at 1107. Thus, a court should abstain where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Conserv. Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1245, 47 L.Ed.2d 483 (1976). The Third Circuit has specifically stated that where a "strong state interest" is at issue, a federal district court should abstain where the exercise of jurisdiction "would interfere with ongoing proceedings pursuant to a state regulatory scheme." *General Glass Indus. Corp. v. Mounsour Medical Found.,* 973 F.2d 197, 201 (3d Cir.1992).

There is no doubt that a strong state interest of substantial public concern is at issue in this case. The Third Circuit has recognized the strong state interest in the "regulation of

important state natural resources," *Grode v. Mutual Fire, Marine and Inland Ins. Co.,* 8 F.3d 953, 956 (3d Cir.1993), and the New Jersey Supreme Court has recognized that the regulation of hazardous waste is of unique concern in this state. *See Matter of Kimber Petroleum Corp.,* 110 N.J. 69, 88–89, 539 A.2d 1181 (1988). Therefore, this court should be wary of interfering with New Jersey regulations in this area.

We also find that the prospective relief requested in plaintiff's complaint would unduly interfere with DEPE's promulgation of the new regulations. In doing so we point out that, if plaintiff challenged an *existing* regulatory scheme as unconstitutional, we would have no choice but to resolve the issue. In this case, however, plaintiff seeks a declaration that withdrawn regulatory practices were unconstitutional and an injunction preventing these practices in the future.[4] Given that New Jersey is currently reformulating the manner in which it will prioritize hazardous sites, such relief,[5] based on a regulatory scheme that no longer exists, would unduly interfere with the process of crafting the new scoring system. Therefore, *Burford* abstention is appropriate.

■ We note, however, that while this circuit has not ruled out the possibility of *Burford* abstention in damages cases, *see General Glass,* 973 F.2d at 202, the availability of the doctrine in such cases is suspect. *See Riley v. Simmons,* 45 F.3d 764, 778–80 (3d Cir.1995) (Nygaard, J., concurring). Because plaintiff's request for damages merely requires the court to determine whether defendants' past acts violated plaintiff's constitutional rights, the determination of this issue would not unduly interfere with the ongoing regulatory process. Therefore, abstention

from plaintiff's damage claims is inappropriate.

### 2. *Pullman Abstention*

■ Under *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, abstention may be appropriate where a state court's resolution of an "unsettled" question of state law will avoid a federal constitutional issue, and an erroneous determination of that issue would disrupt important state policies. *See D'Iorio v. County of Delaware,* 592 F.2d 681, 686 (3d Cir.1978). This case, however, does not involve the resolution of unsettled questions of state law but rather requires the court to determine whether defendants' manner of prioritizing contaminated sites violated plaintiff's constitutional rights. No state court determination would obviate the need to resolve this problem. Therefore, abstention under *Pullman* would be inappropriate.

### C. Qualified Immunity

■ Having determined that plaintiff's requests for declaratory and injunctive relief against defendants in their official capacities are either moot or subject to *Burford* abstention, we now turn to plaintiff's claims for damages against defendants in their individual capacities. As an initial matter, we note that a complaint in a civil rights suit should give individual defendants notice of their personal involvement in the alleged wrongs. *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). In this case, defendant Shinn is not mentioned by name in the body of the complaint and apparently became DEPE Commissioner only thirteen days before the complaint was filed. (Defendants' Brief at 23.) Because it would appear that this defendant was joined only in his official capacity in order to obtain prospective relief, the

---

4. At oral argument plaintiff claimed that injunctive relief would not interfere with New Jersey regulatory efforts because plaintiff requests only an injunction prohibiting future unconstitutional acts and DEPE entry onto the Mannington site pursuant to an unconstitutional policy. This, plaintiff argues, would not interfere with the regulatory process because DEPE cannot lawfully promulgate unconstitutional regulations in any case. However, such amorphous injunctive relief would be inherently disruptive since it would force the court to rule on the constitutionality of

just about any subsequent DEPE regulatory or enforcement decision the plaintiff chose to challenge.

5. While *Burford* abstention is most often applied in cases seeking injunctive relief, the Third Circuit has made clear that the doctrine also applies where a party seeks declaratory relief. *See Lac D'Amiante du Quebec, Ltee. v. American Home Assur. Co.,* 864 F.2d 1033, 1045 (3d Cir.1988).

individual damage claims against him will be dismissed.

As to the other defendants, plaintiffs allege that defendants Miller and Delaney initiated the SRP, (Complaint at ¶ 7), that defendant Corcory published the list of sixty-one priority sites in the January 3, 1994, *New Jersey Register*, and that defendants Grayson and Kokas corresponded and met with plaintiffs and generally refused to explain the basis for plaintiff's priority listing. We must now decide whether defendants are entitled to qualified immunity for these acts.

The Supreme Court has held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). A right is "clearly established" when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Although the "very act in question" need not have been previously held unlawful, the right is "clearly established" only if "in light of pre-existing law the unlawfulness [is] apparent." *Id.*

The Third Circuit recently held that the determination of qualified immunity involves "two governing inquiries." *Acierno v. Cloutier*, 40 F.3d 597, 620 (3d Cir.1994) (in banc). First, while a right may be "clearly established" other than through controlling case law directly on point, it must be clear enough that "'reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful.'" *Id.* (quoting *Good v. Dauphin County Social Servs. for Children and Youth*, 891 F.2d 1087, 1092 (3d Cir.1989)). Second, even where the right is clearly established, government officials are entitled to immunity "'if based on the information available to them they could have believed their conduct would be consistent with those principles.'" *Id.* (quoting *Good*, 891 F.2d at 1092). Thus,

qualified immunity protects government officials unless they act in a "plainly incompetent" manner or "knowingly violate the law." *Id.* at 620 n. 16 (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

In this case, plaintiff alleges violations of its procedural and substantive due process rights, as well as equal protection. We will determine separately the "contours" of each allegedly violated right and then determine whether a reasonable official would have believed that her conduct violated plaintiff's rights. *See Waste Conversion, Inc. v. Sims*, 868 F.Supp. 643, 654 (D.N.J.1994).

*1. Procedural due process*

■ Plaintiff first alleges that defendants violated its liberty and property interests without due process of law by using "arbitrary proceedings and actions, and denying Mannington access to the evidence and proceedings allegedly held against Mannington." (Complaint at ¶ 66.) We find no violation of this right because no deprivation of a liberty or property interest occurred.

Although plaintiff's submissions are less than clear on the subject, plaintiff appears to argue that defendants violated its liberty or property rights by prioritizing the Mannington site without first conducting a hearing or informing plaintiff of the basis for its priority listing. However, the requirement of procedural due process is not triggered until there has been a constitutional "deprivation." *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Merely listing Mannington as a "priority" site, without taking any action or requiring Mannington to take any action, is not a deprivation of a constitutionally protected interest. *Cf. Eagle–Picher Indus., Inc. v. EPA*, 759 F.2d 905, 911 (D.C.Cir.1985) (EPA's National Priority List "does not represent a determination that action is necessary, or that the EPA will take action."). Furthermore, a mere listing that does not affect the "legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties" does not trigger the protections of the New Jersey Administrative Procedures Act, *N.J.S.A.* § 52:14B–1 *et seq. See N.J.S.A.* § 52:14B–2(b) (defining

a "contested case" subject to protections of NJAPA). Therefore, because plaintiff had no constitutional right to a hearing, no violation of its procedural due process rights occurred.

### 2. *Substantive due process*

Plaintiff next argues that defendants' actions violated its "substantive due process rights guaranteed by the Fourteenth Amendment to the Constitution." (Complaint at ¶ 66.) The "heightened scrutiny" of substantive due process generally extends only to "fundamental rights." *See Planned Parenthood v. Casey,* —— U.S. ——, —— – ——, 112 S.Ct. 2791, 2804–05, 120 L.Ed.2d 674 (1992); *Knight v. Tape, Inc.,* 935 F.2d 617, 627 (3d Cir.1991). The Supreme Court has defined "fundamental rights" as "those fundamental liberties that are 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if [they] were sacrificed,'" or "those liberties that are 'deeply rooted in this Nation's history and tradition.'" *Bowers v. Hardwick,* 478 U.S. 186, 191–92, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986) (internal quotations omitted). Because plaintiff does not appear to assert, and could not in good faith assert, that the right to be free from regulatory ineptitude is a "fundamental right," heightened scrutiny does not apply.

 Where a governmental action does not implicate a "fundamental right," substantive due process looks only to whether that action was rationally related to a legitimate government interest. *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 692 (3d Cir.1993); *Knight,* 935 F.2d at 627. We have already noted that the protection of the environment is a legitimate, and indeed a compelling, state interest. *See Kimber Petroleum,* 110 N.J. at 88–89, 539 A.2d 1181. The prioritization of contaminated sites is certainly rationally related to this interest.

Plaintiff stresses that the "rational basis" branch of substantive due process also protects against arbitrary and irrational government action. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990); *Parkway Garage,* 5 F.3d at 692. However, while the manner of prioritizing sites described in the complaint may not have been as scientific as plaintiff would like, it is not so unrelated to the state's interest in preventing pollution as to constitute arbitrary government action. Absent any government enforcement action pursuant to that priority system, we find no substantive due process violation.[6]

### 3. *Equal protection*

 Finally, plaintiff alleges that DEPE based the SRP not on the actual environmental hazard presented by a site, but instead on "deep pockets" and the ability to pay for costly remediation. (Complaint at ¶ 65.) We first note that wealth-based classifications do not implicate a "suspect class" under Equal Protection jurisprudence and thus are subject only to rational basis review. *See San Antonio Ind. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

 Rational basis review under the Equal Protection Clause differs from the same review under substantive due process in that it " 'focuses not on whether the law as

---

6. Plaintiff also cites *Zinermon* for the proposition that a substantive due process violation "is complete when the wrongful action is taken," 494 U.S. at 125, 110 S.Ct. at 983, and argues that defendants therefore violated plaintiff's rights when they threatened it with remediation. To support this argument, plaintiff cites two cases holding that zoning regulations are subject to due process review as soon as they are approved by a municipality, even if they have not yet been enforced. *See Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573 (11th Cir.1989); *Crow-New Jersey 32 Ltd. v. Township of Clinton,* 718 F.Supp. 378, 383–85 (D.N.J.1989).

While we agree with the holding of these cases, we find them inapposite to the facts at hand. When a municipality passes a zoning regulation, it acts: anyone who fails to comply with the regulation is subject to punishment. Similarly, if DEPE actually undertook remediation on plaintiff's property and sought to hold plaintiff liable, plaintiff might have a cause of action. *See Kimber Petroleum,* 110 N.J. at 83, 539 A.2d 1181 (DEPE recovery actions are "subject to judicial review as any other action."). Being designated a priority site, however, did not impose on the plaintiff any legal remediation obligation which did not already exist in applicable statutes or regulations.

a whole is rationally related to a legitimate state interest, but on whether any classifications drawn by the law between classes of citizens are rationally related to the goal to be achieved.'" *Knight*, 935 F.2d at 627 (quoting *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439–40, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985)). On its face, the RPS makes no distinction between "deep pockets" and "non-deep pockets" polluters. However, an equal protection claim may lie when government officials use their discretion under a facially neutral statute to target a specific group. *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). In such a case, the plaintiff must prove that the defendants' actions were motivated by actual discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 236, 96 S.Ct. 2040, 2045–46, 48 L.Ed.2d 597 (1976).

We also note that in the realm of " 'economic and social welfare legislation, it is rare that any law or classification would be held to violate substantive due process or equal protection principles under the rationality standard.'" *Knight*, 935 F.2d at 627 (quoting J. Nowak, R. Rotunda & J. Young, *Constitutional Law* 356 (3d ed. 1986)). However, courts have on occasion found that government action is not rationally related to a legitimate government interest. *See Cleburne*, 473 U.S. at 447–50, 105 S.Ct. at 3258–60 (ordinance requiring a special use permit for a home for the mentally retarded but not other uses lacks rational basis).

 In this case, the legitimate interest at issue is the protection of the environment. We find that the consideration of wealth in prioritizing hazardous waste sites could be rationally related to this interest. Targeting sites for priority remediation serves in part to encourage site-owners to undertake voluntary remediation. If the government instead prioritized sites where the alleged polluters could not afford to undertake remediation, either the government would bear the cost of remediation or no remediation would occur. Thus, the government has some legitimate interest in targeting sites owned by those able to afford remediation.

In so holding, we note that contrary to plaintiff's assertions, being listed as a "priori-ty" site does not necessarily mean that the site is one of the most polluted in New Jersey. It merely means that it will be one of the first cleaned up in New Jersey. *See* 25 *N.J.Reg.* 259(c). While environmental cleanup should to some extent be based on the level of environmental contamination at a site, it may be based on other factors as well. The Equal Protection Clause does not require the government to regulate at a level of "mathematical nicety." *Lindsley v. National Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). *See also Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir.1985) ("The Constitution does not require states to enforce their laws ... with Prussian thoroughness as the price of being allowed to enforce them at all.... Selective, incomplete enforcement of the law is the norm in this country.") (internal citations omitted).

In this case, the facts alleged in plaintiff's complaint show that defendants did to some extent consider the level of contamination at the Mannington site in making the priority determination, although they may not have considered it in the manner plaintiff would have liked. The fact that wealth may have played a supplemental role in this determination does not violate the Equal Protection Clause.

### 4. *Clearly established rights*

 We have held that defendants did not violate plaintiff's constitutional rights. Even if we entertained the possibility that a court might construe defendants' actions as violating plaintiff's constitutional rights, we would dismiss the damages claims because these rights are not "clearly established" and defendants are entitled to qualified immunity.

Determining whether a right is clearly established "depends upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). For example, the *Anderson* Court recognized that "the right to due process of law is quite clearly established by the Due Process Clause." *Id.* However, the

Court made clear that a vague allegation that a state official's actions violated a plaintiff's amorphous "due process" rights would not overcome qualified immunity. Instead, the right must be clearly established "in a more particularized, and hence more relevant, sense: The contours of the right at issue must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039.

Plaintiff has not even attempted to define the contours of the right that defendants allegedly violated. Instead, plaintiff argues:

> [D]efendants have violated Mannington's rights of substantive due process, procedural due process and equal protection. These rights are "clearly established" as the fundamental American bulwarks against official corruption and oppression. There is no legal question that government unfairness, duplicity and coercion are forbidden.

(Plaintiff's Brief at 16.)

While this argument is certainly passionate, it does not provide the Court with any significantly relevant level of particularity at which to evaluate plaintiff's claims. On that ground alone, the court could dismiss plaintiff's claim.

■ However, the court also finds that plaintiff could not identify any clearly established constitutional right that a reasonable official in defendants' position would believe they violated. As an initial matter, we note that officials generally are not held liable when they make decisions based on erroneous information. *See Fisher Bros. Sales, Inc. v. United States,* 46 F.3d 279 (3d Cir. 1995) (administrative decision based on allegedly negligent laboratory reports within the discretionary function exception to the Federal Tort Claims Act). Plaintiff here does not argue that its constitutional rights were violated because it was deemed a priority site but rather argues that its priority status was based upon erroneous or insufficient information. We discern no clearly established constitutional right that would be violated by such action.

Plaintiff also alleges that defendants acted in bad faith in targeting Mannington as a priority site. While defendants' subjective intent may be relevant to both plaintiff's substantive due process claim, *see Parkway Garage,* 5 F.3d at 692, and equal protection claim, *see Washington v. Davis,* 426 U.S. at 236, 96 S.Ct. at 2045–46, the law is clear that a mere allegation of bad faith is insufficient to defeat qualified immunity even on a motion to dismiss. *Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2737–38. Instead, the government official's actions must violate clearly established constitutional rights of which a reasonable official would have known. *Id.* at 818, 102 S.Ct. at 2738. Because defendants' actions in this case, even if taken in bad faith, did not violate plaintiff's clearly established constitutional rights, defendants are entitled to qualified immunity.

Furthermore, plaintiff's allegation that defendants' actions were taken in bad faith is in itself undermined by the applicable law. All of the actions taken by defendants, including the issuance of MOAs and ACOs, are authorized by DEPE's Oversight Rules, *N.J.A.C.* § 7:26C. The New Jersey Supreme Court has held such "necessarily strict enforcement machinery" constitutional. *Kimber Petroleum,* 110 N.J. at 83, 539 A.2d 1181. Therefore, not only is there an absence of case law ruling defendants' conduct in this case unconstitutional, but there is authority from the New Jersey Supreme Court that the conduct passes constitutional muster. Based on this state of the law a reasonable official would certainly conclude that her conduct did not violate plaintiff's clearly established rights.

These doctrines of discretionary functions, objective reasonableness, and adherence to valid state law all show that defendants are entitled to qualified immunity. However, from a practical standpoint, the most distinctive aspect of this case is that defendants took no enforcement actions against plaintiff. No fines were levied; no remedial actions were undertaken; no time constraints were imposed. Instead, the state simply took preliminary steps toward formulating a priority system. No reasonable official would believe that merely considering regulatory action would violate a potential regulatory target's

constitutional rights. Therefore, all defendants are entitled to qualified immunity for their actions.

## IV. CONCLUSION

An industrial plant generally produces a complex and variable waste stream about which regulators usually have imperfect knowledge, not only about what is being emitted on a current basis, but also about the impact of emissions going back for decades or even centuries. Indeed, the environmental oversight process is to a great extent a continuous governmental struggle for more accurate information on which to premise regulatory or enforcement action. The Mannington–DEPE struggle exemplifies how this struggle can grow fractious. Environmental knowledge about the present and past impact of a factory's waste stream is not easy to come by; knowing what to look for and understanding what one finds involves difficult scientific issues and sometimes inconclusive results. And the search itself can be excruciatingly expensive with tests of a single sample running into thousands of dollars.

Federal courts should be hesitant to find a constitutional deprivation every time a state environmental regulator predictably uses inaccurate or incomplete information, unless that use results in a real constitutional deprivation. A regulator's demand that a company undertake environmental remediation causes such a deprivation only if that demand is backed up by some form of enforcement action, and then only if the state fails to afford the company due process in contesting the legality of that action. Neither DEPE's demand that Mannington enter an ACO or an MOA, which it refused to do, nor Mannington's inclusion as a priority site on the SRP list, later withdrawn by DEPE, constitutes a deprivation which meets that standard.

Plaintiff's claims for prospective relief are dismissed as moot, or in the alternative, pursuant to the doctrine of *Burford* abstention. Plaintiff's claims for damages are dismissed pursuant to the doctrine of qualified immunity.

We stress that in so holding we do not pass on the merits or legality of any past or future RPS. This is a question for the New Jersey courts to decide. Instead, we merely hold that defendants' actions have not violated plaintiff's clearly established rights and that prospective relief against such further actions is unwarranted. Only if an established and implemented RPS resulted in a deprivation of constitutional rights could this court's jurisdiction be invoked.