OPINION OF THE COURT
DALZELL, District Judge.
This appeal involves the question of whether a bankruptcy court judge may, consistent with Article III of the United States Constitution, opine and rule upon an objection that was known to him to have been withdrawn prior to the issuance of his opinion and order. Because we hold that the bankruptcy judge was constitutionally disabled from taking such action under such circumstances, we will vacate his advisory opinion and order.
I.
Heldor Industries, Inc. (the “Debtor”), a manufacturer and seller of prefabricated swimming pool packages and related products, on December 7, 1990 filed a petition for reorganization under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq., and thereafter remained in possession. The Debtor’s headquarters and manufacturing operations were conducted on real property leased in two New Jersey locations.
After attempting to sell its business, the Debtor concluded an agreement to sell substantially all of its assets to HI Acquisition Corp. (“HI”). The New Bank of New England, N.A. (the “Bank”), the principal secured creditor, objected, and further negotiations between the Debtor and HI occurred. The Bank ultimately supported a *704 new sale agreement among the Debtor, HI and Hi’s parent, Aqua Fab Industries, Inc. Unlike the original sale agreement, the amended document did not contain terms requiring the Debtor to comply with New Jersey’s Environmental Clean-Up Responsibility Act, N.J.S.A. 13:lK-6 et seq. (“ECRA”). The Bank consented to the new sale agreement, which proffered it for the approval of the bankruptcy court.
Hearings took place on the amended sale agreement on March 25, 26 and 27,1991, at which the Official Unsecured Creditors Committee pressed its objection. After further negotiations, the Committee’s objection was settled and the proposed sale received bankruptcy court approval on March 27, 1991. Although the New Jersey Department of Environmental Protection (the “DEP”) received notice concerning the proposed sale, it did not object to it.
On April 23, Heldor applied to the bankruptcy court for approval of the settlement agreement concerning the sale and the resolution of the Committee’s objection. The DEP and another creditor objected, and hearings were held on May 20 and July 9, 1991. The bankruptcy court overruled the other creditor’s objection on July 9, but the DEP pressed its objection because the DEP contended that the settlement agreement was not in compliance with ECRA since no funds were set aside from the sale proceeds for ECRA compliance. The bankruptcy judge reserved his decision after the July 9 hearing on DEP’s objection, and stated he would issue an opinion within “a couple of months.”
By an August 9, 1991 letter, the DEP advised the bankruptcy judge that “[t]he State wishes at this time to withdraw its objection, filed on May 8, 1991, to the Settlement Agreement in the above captioned matter.” The letter then explained the reasons for this withdrawal, and concluded that “[t]he object of ECRA having been achieved the State will not hold up the distribution of proceeds any longer and formally withdraws its objections effective immediately.” On August 15, 1991, counsel for the Debtor, Karen A. Giannelli, Esquire, transmitted to the bankruptcy judge a proposed form of order approving the settlement agreement. In the first paragraph of her letter, Ms. Giannelli noted, “The State has since withdrawn its objection by letter dated August 9, 1991.”
According to the transcript of the telephonic conference among counsel for the Debtor, DEP, other creditors and the bankruptcy judge held on September 27, 1991, the bankruptcy judge was on vacation at the time the DEP’s letter was received. On the other hand, the bankruptcy judge stated (70a):
However, I did see Ms. Giannelli’s letter, I forget what the date was — I think it was dated August 16th or something, which referred to the withdrawal of the DEP’s objection. That was the first notice that I had that the DEP had withdrawn it’s [sic ] objection. However, I did not see Ms. Giannelli’s letter until something like August 27th or 28th when I came back from vacation. I did not see that because vacation intervened.
Although he was aware by no later than August 28, 1991, that the DEP’s objection had been withdrawn, on September 6, 1991, the bankruptcy judge issued his Memorandum Opinion, In re Heldor Industries, Inc., 131 B.R. 578 (Bankr.D.N.J.1991), which “addresses an objection by the New Jersey Department of Environmental Protection ... to a proposed settlement involving distribution of the proceeds of a sale of substantially all of the Debtor’s assets”, id. at 580, and concluded, at 588, with the order that the “DEP’s objection to the settlement in this case is overruled, and the settlement is approved.”
As noted, a telephonic conference was held on September 27, 1991, at which the DEP objected at length to the issuance of this September 6 opinion. Among other things, the opinion held that various parts of ECRA were unconstitutional under the United States Constitution because of violations of the Supremacy Clause of Article VI and the Takings Clause of the Fifth Amendment, id. at 586-587. In explaining why he issued his September 6 memorandum notwithstanding his knowledge that *705 “the objection had been withdrawn”, the bankruptcy judge stated:
In most instances in a situation like that, in virtually — well, certainly in most similar circumstances I would stop working on an adjudication of the dispute and let the matter be resolved by the parties as proposed if there were no legal or equitable reason to do otherwise. However, in this situation, when I finally saw Ms. Giannelli’s letter, the opinion that I finally filed on September 6 was substantially complete. It was finished except for essentially citation and grammatical checking, and I decided and elected that, notwithstanding notice that there may be a withdrawal of the objection, to issue the opinion anyway. And I did that for what I consider to be compelling reasons.
The bankruptcy judge therefore refused to vacate his September 6 memorandum and the order that concluded it, but did on September 27, 1991 issue an order approving the sale.[1] On October 1, 1991, another telephonic conference was held with the bankruptcy judge, counsel for the Debtor, DEP, and others, at which the DEP’s counsel said that she, on behalf of the State, wanted to “file a motion to vacate the judgment” or, in the alternative, that the bankruptcy judge withdraw the September 6 opinion. After heated colloquy, the bankruptcy judge stated, “don’t expect me to vacate the opinion because I have no intention of doing so. Whereupon the DEP filed a notice of appeal to the United States District Court for the District of New Jersey “from the Memorandum Opinion dated September 6, 1991 and the final order of the United States Bankruptcy Court for the District of New Jersey entered on October 1, 1991.”
On April 21, 1992, the district court affirmed the bankruptcy court, In re Heldor Industries, Inc., 139 B.R. 290 (D.N.J.1992), and held that the withdrawal of the DEP’s objection to the terms of the proposed settlement was not moot within the meaning of Article III of the Constitution. The DEP timely filed its notice of appeal from this decision.
II.
We have jurisdiction of this appeal pursuant to 28 U.S.C. § 158(d), since this is an appeal from a final judgment of a district court approving a final decision of the bankruptcy court.[2] We consider questions related to mootness issues under a plenary standard of review. Huber v. Casablanca Industries, Inc., 916 F.2d 85, 107 (3d Cir. 1990).
The actions taken and views expressed below require us to consider some first principles of Article III jurisprudence in connection with our analysis of this appeal. *706 Article III extends “the judicial Power of the United States” to “all Cases” of three classes and to “controversies” of six others. Although it is possible to parse distinctions between a “controversy” and a “case” as Justice Field did in In re Pacific Railway Comm’n, 32 F. 241 (C.C.D.Cal. 1887), the record of the Framers supports the more common modern practice to merge the terms, as Justice Frankfurter did in Joint Anti-Fascist Refugee Comm, v. McGrath, 341 U.S. 123,150, 71 S.Ct. 624, 637, 95 L.Ed. 817 (1951) (concurring opinion) (“case or controversy”).
What survives from the Framers’ deliberations is that it was “generally supposed that the jurisdiction given was constructively limited to cases of a Judiciary Nature.” 2 Farrand, The Records of the Federal Convention of 1787, 430 (Madison, August 27) (1911) (“Farrand”). This record is quite clear that the Framers did not wish the federal “judicial Power” to extend beyond “cases of a Judiciary Nature.” The delegates in Philadelphia in the summer of 1787 consistently “defeated a variety of proposals to give non-judicial functions” to the court(s) to be created under Article III. Hart & Wecksler’s The Federal Courts and the Federal System 7 (3d ed., 1988). Most pertinent to the present inquiry was their consistent rejection of any power to render what we now call advisory opinions. See, for example, the failure of Charles Pinckney’s proposal that “Each branch of the Legislature, as well as the Supreme Executive shall have authority to require the opinions of the supreme Judicial Court upon important questions of law, and upon solemn occasions.” 2 Farrand 341 (Journal, August 20).[3]
The Federal Convention’s decision in 1787 to avoid the submission of advisory questions to Article III judges was confirmed six years later in the celebrated Correspondence of the Justices. Secretary of State Jefferson transmitted twenty-nine questions, pertaining to extant “treaties between the United States and France”, on President Washington’s behalf to the Supreme Court. On August 8, 1793, Chief Justice Jay and his colleagues politely declined the request, noting the separation of powers “being in certain respects checks upon the other, and our being judges of a court in the last resort”.[4]
Thus, it is clear from this record that the Framers’ aversion to federal courts deciding abstract or hypothetical questions stemmed as much from concerns about the separation of powers as from their desire to limit jurisdiction to “cases of a Judiciary nature”. That this was a distinctly American limitation on the meaning of “cases” is affirmed by the reality that, “at least by 1770, it was well-recognized that English judges had the power to give advisory opinions.” 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3529.1, pp. 293-94 (2d ed. 1984) [citation omitted].
III.
Article Ill’s reference to “cases” and “controversies” thus represents the first critical threshold to federal court jurisdiction. As the Supreme Court put it in North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971), “federal courts are without power to decide questions that cannot affect the right of litigants in the case before them.” Article III also disables federal courts from taking any action in moot cases, and the Supreme Court has repeatedly affirmed that this disability “to review moot cases derives from the requirement of Art. Ill of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.” Liner v. Jafco, Inc., 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 394 n. 3, 11 L.Ed.2d 347 (1964); see also Powell v. McCormack, 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 1951 n. 7, 23 L.Ed.2d 491 (1969); Sibron v. New York, 392 U.S. 40, *707 50 n.'8, 88 S.Ct. 1889, 1896 n. 8, 20 L.Ed.2d 917 (1968).[5]
What is a “case or controversy”? As Justice Frankfurter noted in his concurrence in Joint Anti-Fascist Refugee Comm. v. McGrath, supra, “the jurisdiction of the federal courts can be invoked only under circumstances which to the expert feel of lawyers constitute a ‘case or controversy’ ”. Id. Seventeen years later, Chief Justice Warren observed, with respect to “cases” and “controversies”, that “those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.” Flast v. Cohen, 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968). From Chief Justice Hughes’s approach to defining “cases” or “controversies” in Aetna Life Insurance Co. v. Ha-worth, 300 U.S. 227, 240-241, 57 S.Ct. 461, 463-64, 81 L.Ed. 617 (1937)[6] to Justice Scalia’s for a unanimous Court in Lewis v. Continental Bank Corp., 494 U.S. 472, 477, 110 S.Ct. 1249, 1253, 108 L.Ed.2d 400 (1990)[7], the Supreme Court’s understanding that “cases” or “controversies” require antagonism and concreteness has been consistent with the Framers’ view of the “limited” jurisdiction Article III conferred on the courts created pursuant to it.[8]
All of these formulations confirm for us that no “case” or “controversy” existed between the DEP and the Debtor by August 9, 1991 or, at the latest, when the bankruptcy judge learned of the withdrawal of DEP’s objection on August 28, 1991. After that withdrawal, the controversy between the DEP and the Debtor was moot, and the September 6, 1991 memorandum necessarily became an answer to a question not asked. The memorandum was, therefore, in every sense “advisory”.
In upholding the bankruptcy judge’s action, the district court stated that the matter was not moot in an Article III sense “due to the deliberate act of a party, rather than due to happenstance”, citing this court’s decision in Clarendon Ltd. v. Nu-West Industries, Inc., 936 F.2d 127,130 (3d Cir.1991). The district court did not address the advisory nature of the September 6 action.
While it is true that the “voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot”, United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953), those cases, of which Clarendon is one, are simply inapplicable here. The issue before the bankruptcy judge did not concern the propriety of a *708 DEP regulation or practice, i.e., a position of general regulatory significance that the agency could reassert at will. If that were the case, the W.T. Grant exception to the mootness doctrine might conceivably apply.
Nor does this case fit the pattern in Clarendon. There, the parties settled the dispute during the pendency of an appeal from the granting of a summary judgment motion. Quoting United States v. Garde, 848 F.2d 1307, 1311 (D.C.Cir.1988) (“We do not wish to encourage litigants who are dissatisfied with the decision of the trial court ‘to have them wiped from the books’ by merely filing an appeal, then complying with the order or judgment below and petitioning for a vacatur of the adverse trial court decision”), this court held that it was not required to vacate the summary judgment in accordance with United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950).[9] Unlike the parties in Clarendon, the DEP did not wait for the district court’s decision and then try to moot it by settlement. Since the bankruptcy judge announced on July 9 that he would render his decision “in a couple of months”, the DEP on August 9 had no objective basis for expecting an imminent decision, much less an unfavorable one, that it sought in some improper way to head off.
By contrast with Clarendon’s motion in this court to vacate a summary judgment, what was involved here was an objection by the DEP to a negotiated settlement of a dispute. Once the DEP withdrew its objection, it simply could never reassert it about the settlement agreement in question. This alone distinguishes what DEP did here from the “voluntary cessation” jurisprudence upon which the district court relied.
The other major exception to the mootness doctrine that could arguably apply here deals with questions that are “capable of repetition, yet evading review,” Southern Pacific Terminal Co. v. Interstate Commerce Comm’n, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973). As the Supreme Court has noted in later glosses to this doctrine, however, it can only apply “where the following two circumstances were simultaneously present: “(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.” ” Lewis v. Continental Bank Corp., supra 494 U.S. 472, 481, 110 S.Ct. 1249, 1255 (quoting Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)) (quoting Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975)).
Manifestly, the dispute between this Debtor and the DEP is over, and cannot be expected to repeat itself. This fact alone displaces the “capable of repetition, yet evading review” exception. Additionally, the DEP’s substantive position about the primacy of ECRA is, quite simply, not one that would evade review in future cases because its duration is “too short to be fully litigated”. If the DEP, in another bankruptcy case, adhered to its objection to a distribution or sale, that case would present ample opportunity for judicial review of the DEP’s position and the constitutionality of ECRA. It therefore differs from, e.g., disputes between the press and courts as to pretrial gag orders, which the Supreme Court has held subject to the “capable of repetition, yet evading review” standard in Nebraska Press Ass’n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).
Thus, it is clear that there was no “live controversy” for the bankruptcy judge to decide on September 6, 1991, and he was, therefore, constitutionally disabled from doing what he did on that day. While we are sympathetic to the bankruptcy judge when presented with the eleventh-hour negation of a great deal of effort because of *709 DEP’s withdrawal of its objections, and while the issues he sought to decide were ones of unquestioned public importance to the people of New Jersey, we believe he should have recalled the Supreme Court’s admonition in United Public Workers v. Mitchell, 330 U.S. 75, 90-91, 67 S.Ct. 556, 564-65, 91 L.Ed. 754 (1947), that “Should the courts seek to expand their power so as to bring under their jurisdiction ill-defined controversies over constitutional issues, they would become the organ of political theories” and “would properly meet rebuke and restriction from other branches.”
Since from the time of the Framers to the present federal courts have been limited in their power to decide only “cases” or “controversies” and not render advisory opinions, it is apparent that the bankruptcy judge could not exercise “the judicial Power of the United States” over a non-existent dispute on September 6, 1991.
We will therefore reverse the district court and vacate the memorandum opinion and associated order of September 6, 1991.[10]

. By handwritten interlineations, the bankruptcy judge noted in his September 27 order:
2. That the objections of the State have been withdrawn [be, and the same hereby are, overruled for the reasons noted in the Memorandum Opinion dated September 6, 1991.] The boldface language was added and the bracketed words were crossed off.

. At oral argument and at pp. 38-41 of Appel-lees' Brief, it is suggested that this appeal is "procedurally deficient” because of assertedly erroneous designations in the notice of appeal first from the bankruptcy court to the district court and then to us. We find these contentions to be without merit.
The notice of appeal with us properly identifies the final order of the district court from which the appeal was taken. The notice of appeal to the district court unambiguously identified the subject September 6, 1991 opinion and the bankruptcy judge's oral order of October 1, 1991, denying DEP’s oral motion to vacate the September 6, 1991 opinion.
Appellees’ metaphysical distinctions between the appealability of “orders’’ but not of “opinions” also does not persuade. First, the statute conferring jurisdiction upon us in no way suggests a Congressional concern with nomenclature since it gave us "jurisdiction of appeals from all final decisions, judgments, orders, and decrees" in bankruptcy cases. 28 U.S.C. § 158(d). Second, given the reality that the September 6, 1991 action of the bankruptcy court irrevocably and finally (a) overruled a non-existent objection and (b) held a major New Jersey law unconstitutional, it tortures the language and Congress' words in 28 U.S.C. § 158(d) to argue that there is nothing appealable before us.
Finally, although in our view DEP adequately preserved the issues raised in this appeal, since subject matter jurisdiction is at the heart of this appeal the question of waiver is irrelevant.

. Though Pinckney’s proposal was seconded by Gouverneur Morris and referred to the Committee of Detail, 2 Farrand 342, it was never reported out of that body.

. 3 Correspondence and Public Papers of John Jay 486-89 (H. Johnston ed. 1891); 10 Sparks, Writings of Washington 542-45 (1836), contains the twenty-nine questions from President Washington.

. As the Supreme Court also held in North Carolina v. Rice, supra, 404 U.S. at 246, 92 S.Ct. at 404, "[e]ven in cases arising in the state courts, the question of mootness is a federal one which a federal court must resolve before it resumes jurisdiction." Consequently, even where state law would permit a case to be decided because of "the great public interest in the continuing issues raised by" an appeal, federal courts may not under Article III assume jurisdiction over a moot case, De Funis v. Odegaard, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974) (per curiam).

. “A ‘controversy’ in this sense must be one that is appropriate for judicial determination. * * * A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. * * * The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. * * * It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. * * *.’’

. "Article III denies federal courts the power ‘to decide questions that cannot affect the rights of litigants in the case before them,’ [citation omit- • ted] and confines them to resolving “real and substantial controversies] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.” " [citations omitted],

. Although bankruptcy courts are of course not Article III courts, to the extent they exercise “the judicial Power of the United States" they are subject to Article Ill’s jurisdictional constraints. Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 76, 102 S.Ct. 2858, 2874, 73 L.Ed.2d 598 (1982) ("Nor can we discern any persuasive reason, in logic, history, or the Constitution, why the bankruptcy courts here established lie beyond the reach of Art. III.”).

. The general rule on this point in the Federal Circuit is to the contrary, U.S. Philips Corp. v. Windmere Corp., 971 F.2d 728, 731 (Fed.Cir. 1992) cert, granted sub nom. Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp., — U.S. -, 113 S.Ct. 1249, 122 L.Ed.2d 649 (1993).

. As noted in his separate opinion, Judge Ny-gaard is of the view that the bankruptcy judge offended judicial taste but not Article III. We do not believe it will suffice merely to describe the bankruptcy judge’s action of September 6, 1991 as "dictum” and do nothing more. That action declared a major public law of New Jersey unconstitutional in the course of rejecting a non-existent objection. It thus elevates nomenclature over reality to conclude, as our colleague does, that New Jersey really had nothing to be "aggrieved" about when the bankruptcy judge acted as he did on September 6, 1991. Indeed, a database search reveals that at least four courts have since September 6, 1991 cited the bankruptcy judge's opinion with approval, apparently not noticing that it was, in our colleague’s view, "precedent for nothing." Further, if, as Judge Nygaard acknowledges, we and the district court have jurisdiction to review the bankruptcy judge’s refusal to grant New Jersey’s oral motion to vacate the September 6, 1991 action, it does not follow that we are disabled from vacating what we believe was demonstrably a constitutional nullity, and not merely judicial bad manners.