**GRAYS FERRY COGENERATION PARTNERSHIP, et al.**

v.

**PECO ENERGY COMPANY, et al.**

Civil Action No. 98–1243.

United States District Court, E.D. Pennsylvania.

March 19, 1998.

---

Ira B. Silverstein (argued), Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for Plaintiffs.

Raymond T. Cullen (argued), Morgan, Lewis & Bockius, LLP, Philadelphia, PA, for PECO.

Matthew D'Annunzio, Mesirov, Gelman, Jaffe, Cramer & Jamieson, LLP, Philadelphia, PA, for Adwin Cogeneration, Inc.

Karen Moury, Pennsylvania Public Utility Commission, Law Bureau, Harrisburg, PA, for PUC.

## MEMORANDUM

DALZELL, District Judge.

Alleging that a $158 million power generation enterprise will in a matter of weeks go out of business by reason of its primary customer's wrongdoing, plaintiffs on March 9, 1998 filed this action and a motion for preliminary injunction to prevent this feared catastrophe.

Specifically, plaintiffs Grays Ferry Cogeneration Partnership ("Grays Ferry"), Trigen–Schuylkill Cogeneration, Inc. ("Trigen–Schuylkill"), NRGG (Schuylkill) Cogeneration, Inc. ("NRGG"), and Trigen–Philadelphia Energy Corporation ("Trigen–Philadelphia") seek a preliminary injunction enjoining defendant PECO Energy Company ("PECO") from breaching and terminating its Power Purchase Agreements with Grays Ferry, compelling PECO to pay the rates set forth in these Agreements, and compelling PECO promptly to file an application with defendant Pennsylvania Public Utility Commission ("PUC") for approval of these Agreements as recoverable costs under the "Electricity Generation Customer Choice and Competition Act," 66 Pa.Cons.Stat.Ann. § 2801 *et seq.*. After granting plaintiffs expedited discovery and requiring extensive briefing on the issues of our jurisdiction and the merits, we heard oral argument today on the jurisdiction issue. Upon review of the parties' prehearing memoranda in light of the contentions made at the oral argument, we conclude that we are without power to adjudicate the merits of this controversy.

## I. *The Basic Legal Landscape*

Under the Federal Power Act, 16 U.S.C. § 791a *et seq.*, any entity that owns or operates facilities used to transmit or sell electric energy in interstate commerce is subject to the jurisdiction and regulatory powers of the Federal Energy Regulatory Commission ("the FERC"). *See* 16 U.S.C. § 824. In 1978, amid the then-energy crisis, Congress amended the Federal Power Act with the enactment of the Public Utility Regulatory

Policies Act ("PURPA"). Congress adopted PURPA to encourage the development of alternative energy sources in an effort to reduce dependence on foreign oil. Congress believed that two significant obstacles impeded the development of alternative energy sources: first, the reluctance of traditional electric utilities to purchase energy from, and sell energy to, nontraditional facilities, and, second, the substantial financial burdens imposed on non-traditional facilities by pervasive federal and state regulation. *See FERC v. Mississippi*, 456 U.S. 742, 750–51, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982) (citing legislative history of PURPA).

To overcome the first obstacle to development of nontraditional sources, PURPA requires electric utilities to purchase electric energy produced by independent power producers operating so-called "qualifying cogeneration facilities" ("QFs").[1] *See* 16 U.S.C. §§ 796(18)(B), 824a–3. Congress directed the FERC to promulgate rules and regulations governing the terms of such purchases and sales, and state agencies such as the PUC are empowered to implement the rules and regulations.[2] *See* 16 U.S.C. § 824a–3(f).

To overcome the second obstacle, PURPA requires the FERC to implement regulations exempting QFs from federal regulation to which traditional electric utilities are subject, including most provisions of the Federal Power Act and "[s]tate laws and regulations respecting the rates, or respecting the financial or organizational regulation, of electric utilities." 16 U.S.C. § 824a–3(e)(1).[3]

Congress was also concerned about limiting the cost of electricity to consumers. PURPA therefore provides that no rule re-

---

**1.** A cogeneration facility is one which produces electrical energy, and steam or forms of useful energy which are used for industrial commercial, heating, or cooling purposes. *See* 16 U.S.C § 796(18)(A). In order to qualify as a QF, a facility must meet the requirements set forth by the FERC, *see* 18 C.F.R. § 292 .101 *et seq.*, and the facility must be owned by an entity not primarily engaged in the generation or sale of electrical power. *See* 16 U.S.C. § 796(18)(B).

**2.** The PUC is an independent state administrative commission authorized to regulate public utility companies doing business in Pennsylvania. *See* 66 Pa.Cons.Stat.Ann. § 301, 501. The Pennsylvania Public Utility Code provides the PUC with

broad authority to "supervise and regulate" public utilities doing business in Pennsylvania. *See id.* at § 501(b). PUC regulations, like their FERC counterpart, require utilities to purchase energy from "qualifying facilities." 52 Pa.Code § 57.34.

**3.** In response, the FERC promulgated regulations exempting QFs from various federal and state regulatory requirements. The regulations state in pertinent part: "(1) Any [QF] shall be exempted ... from State law or regulation respecting: (i) The rates of electric utilities; and (ii) The financial and organizational regulation of electric utilities." 18 C.F.R. § 292.602(c).

quiring a utility to purchase energy from a QF "shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a–3(b). "Incremental cost of alternative electric energy," which is commonly referred to as the utility's "avoided cost," is defined as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a–3(d), 18 C.F.R. § 292.101(b)(6). In accordance with these provisions, the FERC promulgated regulations governing the transactions between utilities and QFs, including a specific requirement that a utility must purchase electricity QFs make available at a rate up to the utility's full avoided cost. *See* 18 C.F.R. §§ 292.303–304. The states implement these regulations through their appropriate regulatory authorities.

## II. *The Facts Here*

Plaintiff Grays Ferry is a joint venture Pennsylvania partnership that was formed by three different entities, plaintiff Trigen–Schuylkill, plaintiff NRGG, and defendant Adwin.[4] Grays Ferry was created to build and operate a QF in the Grays Ferry section of Philadelphia which would produce both electricity and steam ("the facility"). In the early 1990s, PECO and Grays Ferry entered into several agreements known as "Power Purchase Agreements" ("PPAs"). Pursuant to the PPAs, Grays Ferry agreed to sell to PECO, and PECO agreed for a period of twenty years to purchase from Grays Ferry, the net electric output of the facility at rates set forth in the agreement, beginning with the date of commercial operation.

On September 28, 1992, PECO filed with the PUC a petition for the approval of the original PPAs with Grays Ferry and for approval of recovery from PECO ratepayers of amounts it would pay for the electric energy

produced.[5] By its March 15, 1993 Order, the PUC approved PECO's petition, and held that the PPAs represented an inexpensive source of electrical energy to PECO ratepayers and were "reasonable and consistent with the public interest." Plaintiffs' Complaint Exhibit F at p. 8. The PUC also held that PECO was authorized to "fully collect all amounts paid to Grays Ferry Cogeneration Partnership under the terms of this agreement, on a full and current basis in its Energy Cost Adjustment or such mechanism as may replace its Energy Cost Adjustment in the future." *Id.*

On March 2, 1994, PECO filed a supplemental petition with the PUC for approval of various revisions and addenda to the PPAs with Grays Ferry. By Order of February 9, 1995, the PUC granted PECO's supplemental petition, and again approved the PPAs, which then included the two contingent capacity purchase agreements. *See* Plaintiffs' Complaint Exhibits D, E.

Subsequent to the PUC's approval of the PPAs between PECO and Grays Ferry, the Grays Ferry partnership took a number of steps. It entered into credit facilities with Chase Manhattan Bank and a syndicate of banks to provide $113 million in senior bank financing, arranged for $15 million in subordinated debt from Westinghouse Electric Corporation, and obtained at least $30 million in cash equity from the partners. The credit facility, the subordinated debt, and equity contributions were based upon the revenue projections anticipated from the twenty-year PPAS between PECO and Grays Ferry.

After eighteen months of construction, Grays Ferry began start up and testing in October of 1997. In a press release announcing the start up and testing, PECO represented that it had a long-term agreement with Grays Ferry, and that the electricity produced was enough to power seven office buildings or 45,000 homes. *See* Plaintiffs' Complaint Exhibit G. The Grays Ferry fa-

**4.** Defendant Adwin is a remote subsidiary of PECO. Plaintiffs allege that Adwin is a wholly-owned subsidiary of Adwin Equipment Company, which in turn is a wholly-owned subsidiary of Eastern Pennsylvania Development Company, which in turn is a wholly-owned subsidiary of PECO. Plaintiffs' Complaint at ¶ 7.

**5.** The original PPAs did not contain the two contingent capacity purchase addendum agreements that were subsequently added.

cility began commercial operation two months later.

In addition to electric generation and sales to PECO, Grays Ferry also sells the steam the facility produces to plaintiff Trigen–Philadelphia, a local steam utility. On May 18, 1994, Trigen–Philadelphia and the University of Pennsylvania entered into a steam agreement ("the Penn Agreement"), providing that for a twenty-year term Trigen–Philadelphia will sell steam to the University. See Plaintiffs' Complaint Exhibit H. Plaintiffs assert that University of Pennsylvania is Trigen–Philadelphia's largest customer, accounting for about twenty-six percent of Trigen–Philadelphia's total annual billings, and that Grays Ferry produces most of the steam for Trigen–Philadelphia's purchases for the University. Trigen–Philadelphia also alleges that if it does not place the University of Pennsylvania's steam equipment into service by December 31, 1998, the University has the option of terminating the contract without a penalty. See Plaintiffs' Complaint Exhibit H at ¶ 6.2(d).

In December of 1996, the Pennsylvania General Assembly enacted the "Electricity Generation Customer Choice and Competition Act," 66 Pa.Cons.Stat.Ann. § 2801 et seq. ("the Customer Choice Act" or "the Act"), which was intended to foster competition in retail electricity marketing and allow retail customers to choose among electric generation suppliers. Pursuant to the Customer Choice Act, the movement toward greater retail competition was to be phased-in over a period of time. During the transition to greater competition, the Act allowed the PUC to take steps to ameliorate the effects of this change. See 66 Pa.Cons.Stat.Ann. § 2802(8).

Recognizing that many of the public utilities had long-term contracts that created costs that might not be recoverable in a competitive market, the Customer Choice Act empowered the PUC to determine the level of transition or "stranded costs" for each electric utility and to provide a mechanism called the "competitive transition charge" for the recovery of such stranded costs. In fact, the Act specifically defines "transition" or "stranded costs" to include

"cost obligations under contracts with non-utility generating projects which have received a [PUC] order." 66 Pa.Cons.Stat. Ann. § 2803. In addition, the Act provides that the PUC "shall" allow recovery as a competitive transition charge of "cost obligations under contracts with non-utility generating projects that have received a [PUC] order." Id. at § 2808(c)(1).

The Customer Choice Act required all electric utilities to file restructuring plans for the PUC's review, including requests for competitive transition charges. Plaintiffs allege that PECO filed its restructuring plan with the PUC in April of 1997 requesting recovery of $6.8 billion of transition and stranded costs. Plaintiffs claim that PECO did not include the twenty-year PPAs with Grays Ferry as part of the stranded costs sought to be recovered, and that PECO did not advise Grays Ferry that it had failed to include the twenty-year PPAs.

In December of 1997, the PUC issued its opinion and order on PECO's proposed restructuring plan, finding that:

> PECO does not claim any stranded costs related to non-utility generation contracts or existing Purchased Power Contracts because its contracts generally require market pricing. PECO asserts, and no party introduced any evidence in the record to the contrary, that PECO's existing purchased power commitments are not above projected market prices and therefore do not expose the company to any related stranded costs. Thus, the Commission finds that PECO incurs no stranded costs related to NUG or other Purchased Power contracts.

Plaintiffs' Motion for Preliminary Injunction Exhibit A at p. 77.

On January 15, 1998, PECO informed Grays Ferry that as a result of the PUC's Order, it would not be able to recover from customers the amounts paid for electricity purchases from the Grays Ferry facility. See Plaintiffs' Complaint Exhibit I. In addition, PECO further advised Grays Ferry that it intended to file, "in the next several weeks," a petition requesting full recovery of amounts paid to Grays Ferry. See id. On

February 3, 1998, Grays Ferry advised PECO that it was willing to cooperate with PECO and suggested that the parties meet. *See* Plaintiffs' Complaint Exhibit J. On March 3, 1998, however, PECO notified Grays Ferry that under the circumstances, the PPAs were "no longer in effect" and that PECO "is not obligated to file additional cost recovery petitions" with the PUC. *See* Plaintiffs' Complaint Exhibit K. Unsurprisingly, this suit followed six days later.

Plaintiffs also allege here that pursuant to the PPAs, PECO was supposed to pay Grays Ferry $5,805,797 for electricity sold in January of this year, but that on March 4, after terminating the PPAs, PECO forwarded only $1,843,601, which PECO claims is the "market cost" for such electricity. *See* Plaintiffs' Complaint ¶ 52 and Plaintiffs' Complaint Ex. K.

Plaintiffs now seek a preliminary injunction enjoining PECO from breaching or terminating the PPAs with Grays Ferry, compelling PECO to pay the rates set forth in the PPAs, and compelling PECO promptly to file an application with the PUC for approval of the PPAs as recoverable costs under the Customer Choice Act. In particular, Grays Ferry claims that without the monies due from PECO under the PPAs, Grays Ferry will only be able to continue to operate for a few weeks, and will ultimately be in default of its credit facility and subordinated debt. Similarly, plaintiff Trigen–Philadelphia claims that PECO is tortiously interfering with its contract with the University of Pennsylvania, and without the steam that Grays Ferry provides, it will ultimately lose the Penn Agreement.

Plaintiffs have also joined the PUC in this action, asserting that it is a "necessary and indispensable party," Plaintiffs' Complaint at ¶ 62, because PECO cites the PUC's December, 1997 Order, which precluded recovery of costs under the PPAs, as the predicate PECO cited for terminating the PPAs. Plaintiffs claim that such a preclusion contravenes PURPA, and would be void based upon the

Supremacy Clause of the United States Constitution. On the other hand, while Grays Ferry lists the PUC as a "defendant", the Commission's adversity to plaintiffs was thrown into question by the opening three sentences of the PUC's eight-sentence Prehearing Memorandum, filed yesterday:

> The Pennsylvania Public Utility Commission (PaPUC) has no objection to this Honorable Court granting Plaintiffs' motion for preliminary injunction. The PaPUC views this proceedings as a dispute between PECO Energy Company (PECO) and Grays Ferry Cogeneration Partnership (Grays Ferry). The PaPUC intends to call no witness at the preliminary injunction hearing.

PUC's Prehearing Memorandum at 1.

### III. *Jurisdiction Over the Subject Matter*[6]

█ Do we have jurisdiction over this subject matter? We on March 13 ordered the parties to address this threshold issue after PECO at a scheduling hearing on March 12 raised it as a concern that required early attention. As will be seen, although the problem involves a legal thicket, we conclude that we do not have jurisdiction over this very serious case.

### A. *Is There an Article III "Case" or "Controversy" Between Plaintiffs and the PUC?*

█ "Since from the time of the Framers to the present federal courts have been limited in their power to decide only 'cases' or 'controversies' and not render advisory opinions." *State of New Jersey v. Heldor Industries*, 989 F.2d 702, 709 (3d Cir.1993) (quoting U.S. Const., art. III § 2). In order for a case to be justiciable, and not an advisory opinion, there must be an actual dispute between adverse litigants, and there must be a substantial likelihood that a federal court decision in favor of a claimant will bring about some change or have some palpable effect on the defendant. As the Supreme Court stated in *Hewitt v. Helms*, 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987):

---

6. Inquiries into subject matter jurisdiction impact on our power to hear a case, and such issues may be raised at any time either *sua sponte* or by one of the parties. *See, e.g., Insurance Corp. of Ireland v. Compagnie des Bauxites*

*de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). On the eve of the March 19 hearing, PECO filed a motion pursuant to Fed. R.Civ.P. 12(b)(1) to dismiss for lack of subject matter jurisdiction.

In all civil litigation, the judicial decree is not the end but the means. At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces—the payment of damages, or some specific performance, or the termination of some conduct. Redress is sought *through* the court, but *from* the defendant. . . . The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*

*Id.* at 761, 107 S.Ct. at 2676 (emphasis in original).

■ It seems apparent under this settled jurisprudence that no active case or controversy exists between the plaintiffs and the PUC. The plaintiffs do not allege that the PUC has violated any duty to them or aggrieved them in any way. Indeed, not one of the counts in the plaintiffs' complaint asserts a claim against the PUC.[7] Furthermore, the plaintiffs seek no affirmative relief from the

PUC, other than that if we grant the preliminary injunction, and order PECO to file an application with the PUC, that the Commission "promptly consider the application." Plaintiffs' Motion for Preliminary Injunction at p. 2.

The absence of a cognizable "case" or "controversy" between the plaintiffs and the PUC[8] is further supported by the PUC's Prehearing Memorandum. As noted above, the PUC in that filing describes this proceeding as a dispute solely between PECO and Grays Ferry and informs us that it "intends to call no witness at the preliminary injunction hearing" and will not oppose the granting of the preliminary injunction. *See* PUC's Prehearing Memorandum at 1. With the PUC by its own words removed from *this* action,[9] we now turn to the problem of whether we have federal question jurisdiction over the plaintiffs' claims against PECO.[10]

B. *In Any Event, Are Any of Plaintiffs' Claims "Arising Under" Our Federal Question Jurisdiction?*

■ Federal courts are tribunals of limited, rather than general, jurisdiction. *See,*

---

7. Plaintiffs' Complaint lists six counts: Count I Grays Ferry v. PECO for a declaratory judgment, Count II Grays Ferry v. PECO for specific performance, Count III Grays Ferry v. PECO for breach of contract, Count IV Grays Ferry v. PECO for breach of covenant of good faith and fair dealing, Count V All Plaintiffs v. PECO and Adwin for breach of fiduciary duty, Count VI Trigen–Philadelphia v. PECO and Adwin for tortious interference with a contract.

8. In contending that a case or controversy exists between the plaintiffs and the PUC, plaintiffs at oral argument put great weight on one sentence of *dictum* from *Pope v. United States,* 323 U.S. 1, 65 S.Ct. 16, 89 L.Ed. 3 (1944), in which the Court stated, "When a plaintiff brings suit to enforce a legal obligation it is not any the less a case or controversy upon which a court possessing the federal judicial power may rightly give judgment, because the plaintiff's claim is uncontested or incontestable." *Id.* at 11. Plaintiffs argue that *Pope* teaches that just because the PUC does not oppose the issuance of a preliminary injunction in this case does not make this case non-justiciable. In essence, plaintiffs argue that there is a *potential* factual dispute, and thus a controversy, between the PUC's position that PECO never asked it for cost recovery, and PECO's potential defense that the PUC precluded it from cost recovery on the PPAS. Such a position, however, while perhaps some day creating a case or controversy between the PUC and

PECO, does not create one now between the PUC and the plaintiffs.

Furthermore, plaintiffs' reliance on the *Pope dictum* is in any event misplaced. *Pope* is fundamentally about the Constitutional *power* of Congress to enact legislation conferring jurisdiction on a particular class of cases and creating new obligations on the Government. *Pope* is not a "case" or "controversy" decision, and the Supreme Court has never regarded it as one.

9. At the oral argument this morning, plaintiffs' able counsel did not disagree with our suggestion that the PUC should, in truth, be realigned as party-plaintiff in light of the views expressed in its Prehearing Memorandum. As further discussed *infra,* those views even include agreement with the plaintiffs on the merits of their breach of contract action ("Reliance upon PaPUC action as justification of the cancellation of the PURPA agreement between Grays Ferry and PECO is misplaced." PUC Prehearing Memorandum at 2).

10. In addition, there is also at a minimum a ripeness problem here as well. Neither the PUC nor the plaintiffs allege that PECO ever asked the PUC to recover the stranded costs for its PPAs with Grays Ferry. Thus, on the present record, plaintiffs merely "fault" the PUC for not deciding an issue never proffered to it.

*e.g., Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 376–78, 114 S.Ct. 1673, 1675, 128 L.Ed.2d 391 (1994). Further, "it is to be presumed that a cause lies outside this limited jurisdiction ... and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (citations omitted). In order for a federal court to have jurisdiction over any controversy, the Supreme Court has made clear that "[t]he Constitution must have given the· court the capacity to take it, and an act of Congress must have supplied it." *Finley v. United States*, 490 U.S. 545, 548, 109 S.Ct. 2003, 2006, 104 L.Ed.2d 593 (1989) (internal quotations omitted)(emphasis omitted).

Plaintiffs argue that we have jurisdiction over this matter pursuant to 28 U.S.C. § 1331.[11] Although the statutory language of § 1331 echoes Article III, Section 2 of the Constitution, the Supreme Court has taken a narrower view in interpreting that jurisdictional statute. *See e.g., Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 494–95, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). *See also* Erwin Chemerinsky, *Federal Jurisdiction* § 5.2, 253–55 (1994).

▮ In determining whether an action "arises under" federal law, we are governed by the well-pleaded complaint rule, which requires that a federal question be presented on the face of the complaint. *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); *Louisville & Nashville Railroad Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). When reviewing the face of a complaint for federal question jurisdiction, there are two categories of cases· through which a suit may "arise under" federal law. Justice Holmes phrased the first category: "A suit arises under the law that creates the cause of action." *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260, 36 S.Ct. 585,

60 L.Ed. 987 (1916). The second is when the plaintiff's cause of action is based on state law, but a federal law that creates a cause of action is an essential component of the plaintiff's complaint. *See, e.g., Hopkins v. Walker*, 244 U.S. 486, 37 S.Ct. 711, 61 L.Ed. 1270 (1917).

▮ Turning to the first category of cases, there are in essence three ways in which federal law "creates" a cause of action: first, when a federal law provides both a substantive right and a remedy for vindicating that right, *see, e.g., Feibelman v. Packard*, 109 U.S. 421, 3 S.Ct. 289, 27 L.Ed. 984 (1883), second, when a federal law grants a substantive right and a federal remedy fairly may be *implied* from that right, *see, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), and, third, when federal law so thoroughly preempts state law that it "converts an ordinary state common-law claim into· one stating a federal claim for purposes of the well-pleaded complaint rule." *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) ("complete preemption"). None of these three applies to plaintiffs' claims in this case.

While plaintiffs cite PURPA as the federal statutory predicate for their complaint, they have not alleged private causes of action against PECO that are either expressly or impliedly *created by* PURPA. Rather, plaintiffs' claims against PECO sound in tort and contract—traditional state law claims.[12] *See, e.g., Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 418 (3d Cir.1997) (affirming the district court's decision, upon dismissal of federal antitrust claims, to decline to exercise supplemental jurisdiction over "state law claims" concerning a breach of a PPA entered into pursuant to PURPA); *see also Crossroads*

---

11. 28 U.S.C. § 1331 provides:.
 The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. It is undisputed that all the parties before us are Pennsylvania entities for diversity purposes, save plaintiff NRGG, which is alleged to be a Delaware corporation with its principal place of business in Minneapolis, Minnesota.

12. As noted *supra* n. 7, plaintiffs' complaint lists six counts: Count I for a declaratory judgment, Count II for specific performance, Count III for breach of contract, Count IV for breach of covenant of good faith and fair dealing, Count V for breach of fiduciary duty, Count VI for tortious interference with a contract.

*Cogeneration Corp. v. Orange and Rockland Utilities, Inc.,* 969 F.Supp. 907, 916 (D.N.J. 1997) (holding that plaintiff cogenerator's contract law claim against defendant public utility, while entered into pursuant to PURPA, did not "arise under" PURPA for purposes of jurisdiction, and therefore, could only be premised on diversity of citizenship).

 Nor does this case qualify as a federal question on a complete preemption theory. The complete preemption doctrine operates in narrow areas such as Section 301(a) of the Labor Management Relations Act and Section 502(a) of the Employee Retirement Income Security Act. *See, e.g., Caterpillar, Inc. v. Williams,* 482 U.S. 386, 393–94, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Based upon a review of the relevant case law, there is no evidence that the Supreme Court or our Court of Appeals has treated PURPA as a statute that completely preempts the field of power contracts, and nothing in the text or history of PURPA suggests Congressional intent to grant exclusive federal question jurisdiction over state law claims that may involve or implicate PURPA.[13]

While plaintiffs' complaint does not fit neatly into any of these three lines of analysis, plaintiffs now argue that their action is in truth the creation of PURPA, and "arises under" federal law based upon the decision of our Court of Appeals in *Freehold Cogeneration v. Board of Regulatory Commissioners of the State of New Jersey,* 44 F.3d 1178 (3d Cir.1995). In *Freehold,* the plaintiff, a QF, sought a declaratory judgment against the New Jersey Board of Regulatory Commissioners ("BRC")[14] after the BRC directly ordered the plaintiff and a New Jersey utility to renegotiate its purchase rate under a PPA. Our Court of Appeals concluded that the court had federal question jurisdiction pursuant to § 1331 because the BRC's Order violated the plaintiff's federally-created exemption from such regulation under § 210(e) of PURPA. *See Freehold,* 44 F.3d at 1184–

85. The Court of Appeals decision in *Freehold* appears to be based, in part, upon the Supreme Courts decision in *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), in which the Supreme Court stated:

> It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. . . . A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

*Id.* at 96 n. 14 (citations omitted).

Unlike *Freehold,* however, in this case the plaintiffs cannot allege that a state regulatory authority or a state actor has interfered with their federally-created exemption. *See supra* (finding a lack of "case" or "controversy" as between the plaintiffs and the PUC). Rather, all of plaintiffs' claims in the complaint are premised, in one form or another, on the allegation that PECO, a private, non-diverse entity, wrongfully terminated the PPAs. As noted above, such claims are governed entirely by state contract and tort law, rather than federal law, and it tortures the reality of this dispute to shoehorn it into *Freehold's* mold.

Having failed to allege a cause of action against PECO "created" by federal law, the plaintiffs are left to argue that the resolution of their state law claims somehow requires a determination of federal law. *See, e.g., Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921) (a case "arises under" federal law where a right under state law necessarily turned for its vindication on a construction of federal law). *See also* p. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart and Wechsler's The Fed-*

---

**13.** With the passage of the Johnson Act, 28 U.S.C. § 1342, and § 210(g) of PURPA, 16 U.S.C. § 824a–3(g), it appears that Congress is in fact trying to curtail, rather than expand, federal judicial review over state regulatory authorities and state utility rates. *See Freehold Cogeneration v. Board of Regulatory Commissioners of the State*

*of New Jersey,* 44 F.3d 1178, 1184–86 (3d Cir. 1995) (describing § 210(g) of PURPA and the Johnson Act).

**14.** The BRC serves New Jersey as the Pennsylvania PUC serves the Commonwealth.

*eral Courts and the Federal System,* 889 (2d ed.1973) (a case "arises under" federal law "if in order for the plaintiff to secure the relief sought he will be obliged to establish both the correctness and the applicability to his case of a proposition of federal law."). Since plaintiffs' claims at this time do not affirmatively turn on any particular construction of PURPA, plaintiffs' rights, if any, under that statute only arise in anticipation of PECO's *possible* defenses. An anticipated defense, however, is not part of a plaintiff's well-pleaded complaint. *See Louisville & Nashville Railroad Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908).

*Mottley* is most instructive here. The Louisville & Nashville Railroad settled a claim that Mr. and Mrs. Mottley had against it by agreeing to give them free lifetime passes. In 1906, Congress adopted a statute prohibiting free railroad passes, and the railroad refused to give the Mottleys passes for the following year. The Mottleys sued in federal court for breach of contract and sought specific performance, alleging that the statute did not apply to them, and that if it did, it was unconstitutional. After the district court ruled for the plaintiffs, the Supreme Court, raising the issue of jurisdiction *sua sponte,* found that the federal court lacked subject matter jurisdiction under § 1331 because the plaintiffs' complaint presented a state law claim for breach of contract, and the federal issues only arose from the plaintiffs' anticipation of a defense based upon the federal statute. Speaking for a unanimous Court, Justice Moody explained:

> It is not enough that the plaintiff alleges some anticipated defense to his cause of action, and asserts that the defense is invalidated by some provision of the Constitution of the United States. Although such allegations show that very likely, in the course of the litigation, a question under the Constitution would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under the Constitution.

*Id.* at 152. *See also Caterpillar Inc. v. Williams,* 482 U.S. 386, 393, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (holding that federal question jurisdiction would not exist on the basis of an asserted federal defense, "including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.").

The defenses plaintiffs here anticipate are doubly removed from *Mottley.* As earlier noted, the PUC is plaintiffs' ally, not its adversary. The PUC in its Prehearing Memorandum not only agrees that plaintiffs should win against PECO, but even adopts plaintiffs' legal theory: "Reliance upon Pa-PUC action as justification of the cancellation of the PURPA agreement between Grays Ferry and PECO is misplaced." PUC Prehearing Memorandum at 2.

Our *Mottley* analysis would come to the same conclusion even if the PUC had not been so forthright in its support of plaintiffs here. Throughout their complaint, plaintiffs rehearse the view that PECO violated the PPAs when it intentionally or negligently failed to request stranded cost recovery from the PUC for the PPAs. Plaintiffs only mention the PUC, the Customer Choice Act, and PURPA in the context of the most hypothetical "ifs," in anticipation of PECO's defense that the Customer Choice Act or the PUC prevented PECO from receiving cost recovery from PECO's customers of the amounts paid for electricity purchases from the Grays Ferry Project. Plaintiffs' subjective voice on this point is quite revealing: "*If* the Customer Choice Act or the December PUC Order were to permit PECO to alter the terms of the Power Purchase Agreements, the Customer Choice Act and the December PUC Order would be inconsistent with and preempted by PURPA and FERC regulations promulgated thereunder which exempt QFs from state utility regulation." Plaintiffs' Complaint at ¶ 67 (emphasis added). Such hypothetical responses to anticipated defenses are simply not a basis for federal question jurisdiction.

It is of no moment to this analysis that plaintiffs seek declaratory relief in Count One. The Supreme Court almost half a century ago confirmed that the presence of a declaratory judgment does not change the "arising under" rules we have just canvassed.

In *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), the Supreme Court held that it would "distort the limited procedural purpose of the Declaratory Judgment Act" to find "arising under" federal question jurisdiction based on declaratory judgments that anticipate federal defenses. *Id.* at 673–74.

The power of the *Skelly Oil* rule was thrown into remarkably bold relief thirty-three years later in a case where an issue of federal preemption was explicitly raised in a declaratory judgment action, though one bottomed on a state law controversy. In *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), the California Tax Board filed suit in state court against an employee welfare benefit plan that was subject to regulation under ERISA. The Board sought $380 in taxes that the Vacation Trust had refused to pay from three members' funds, and sought a declaratory judgment that ERISA did not preempt the state's ability to obtain these funds from the Vacation Trust. The Board asserted this latter claim because ERISA was the only justification the Trust gave the Tax Board for not seeking payment of these taxes from the tax delinquent members. The Trust removed the case to federal court, but a unanimous Supreme Court, through Justice Brennan, applied *Mottley* and *Skelly Oil* and held that the action did not arise under ERISA. Because the Tax Board's claim was founded on state law and the ERISA issue could only arise as a defense, the Court held that, as explained four years later in *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), "ERISA preemption, without more, does not convert a state claim into an action arising under federal law." [15]

Plaintiffs' preemption claims here are less directly involved than in *Franchise Tax Board.* Unlike the Vacation Trust, no defendant here has explicitly invoked PURPA to justify their actions or inactions. Even if any did, they would have done no more than what the Supreme Court held to be of no jurisdictional consequence in *Franchise Tax Board.* [16]

We therefore conclude that we are without power to address the merits of plaintiffs' weighty claims.

### *ORDER*

AND NOW, this 19th day of March, 1998, upon consideration of defendant PECO Energy Company's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), and after argument this morning on the question of subject matter jurisdiction, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. Defendant PECO Energy Company's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) is GRANTED;

2. Plaintiffs' complaint is DISMISSED for lack of subject matter jurisdiction; and

3. The Clerk shall CLOSE this case statistically.

---

**15.** It is true that the *Mottley/Skelly Oil rule* has many eminent detractors. *See, e.g.,* Paul J. Mishkin, The Federal "Question" in the District Courts, 53 Colum.L.Rev. 157, 162–63 (1953). It is nevertheless firmly entrenched in the Supreme Court's jurisprudence and we are, of course, bound by it.

**16.** As we have found that we lack subject matter jurisdiction over this case under 28 U.S.C. § 1331, we need not address whether § 210(g) of PURPA, 16 U.S.C. § 824a–3(g), divests our authority to hear this case.